Exhibit A

AMENDED AND RESTATED DEFINED CONTRIBUTION PLAN

MASTER TRUST AGREEMENT

by and among

COLGATE-PALMOLIVE COMPANY,

COLGATE-PALMOLIVE COMPANY PENSION FUND COMMITTEE, AS THE
NAMED FIDUCIARY

and

THE BANK OF NEW YORK MELLON

and known as the

COLGATE-PALMOLIVE SAVINGS & INVESTMENT PLANS MASTER TRUST

## TABLE OF CONTENTS

**PAGE**

**SECTION 1—ESTABLISHMENT OF MASTER TRUST; INSTRUCTIONS** ....................... 1
1.1      Definitions .................................................................................................1
1.2      Compliance with Law ...............................................................................4
1.3      Establishment of Fund .............................................................................4
1.4      Contributions ...........................................................................................4
1.5      Exclusive Benefit .....................................................................................4
1.6      Return of Contributions ...........................................................................4
1.7      Distributions .............................................................................................5
1.8      Commingling ............................................................................................5
1.9      Authorized Instructions ...........................................................................5
1.10    Authentication .........................................................................................5
1.11    Security Procedure ..................................................................................6
1.12    On-Line Systems .....................................................................................6
<u>1.13</u>    <u>Information Security</u> ..............................................................................6
1.14    Custody of Assets of PR Plan ................................................................6

**SECTION 2—MASTER TRUST SERVICES** ....................................................... 7
2.1      Holding Securities ...................................................................................7
2.2      Subcustodians .........................................................................................7
2.3      Depositories .............................................................................................8
2.4      Agents......................................................................................................8
2.5      Master Trustee Actions without Direction ...............................................8
2.6      Master Trustee Actions with Direction ....................................................9
2.7      Foreign Exchange Transactions ............................................................10

**SECTION 3—INVESTMENT OF THE FUND**.................................................... 10
3.1      Establishment of Accounts.....................................................................10
3.2      Participant Direction................................................................................10
3.3      Appointment of Investment Managers.....................................................11
3.4      Qualifying Employer Securities ..............................................................11

**SECTION 4—CORPORATE ACTIONS** ........................................................... 14
4.1      Notification..............................................................................................14
4.2      Direction..................................................................................................14
4.3      Partial Redemptions, Payments, Etc......................................................14

**SECTION 5—SETTLEMENT OF TRADES** ....................................................... 15
5.1      Trading Instructions ................................................................................15
5.2      Contractual Settlement and Income ........................................................15
5.3      Trade Settlement.....................................................................................15

**SECTION 6 – DEPOSITS AND ADVANCES** .................................................... 15
6.1      Deposits ..................................................................................................15
6.2      Sweep .....................................................................................................15
6.3      Overdrafts and Indebtedness ..................................................................16
6.4      Securing Repayment...............................................................................16

**SECTION 7—TAXES, REPORTS, RECORDS AND OTHER MATTERS** ....................... 16

| | | |
|---|---|---|
| 7.1 | General Tax Responsibilities | 16 |
| 7.2 | Specific Tax Responsibilities | 17 |
| 7.3 | Pricing and Other Data | 17 |
| 7.4 | Net Asset Value Calculation Service | 18 |
| 7.5 | Statements and Reports | 19 |
| 7.6 | Participant Records | 20 |
| 7.7 | Review of Reports | 20 |
| 7.8 | Inspection of Books and Records | 20 |
| 7.9 | Required Disclosure | 20 |
| 7.10 | Centralized Functions | 21 |
| 7.11 | Sanctions | 21 |

**SECTION 8—PROVISIONS REGARDING MASTER TRUSTEE** .......... 21

| | | |
|---|---|---|
| 8.1 | Standard of Care | 21 |
| 8.2 | Duties | 22 |
| 8.3 | Limitation on Liability | 22 |
| 8.4 | Force Majeure | 23 |
| 8.5 | Fees | 23 |
| 8.6 | Indemnification | 23 |

**SECTION 9 – AMENDMENT; REMOVAL OR RESIGNATION; ASSIGNMENT; PLAN TERMINATION** .......... 23

| | | |
|---|---|---|
| 9.1 | Amendment | 23 |
| 9.2 | Removal or Resignation | 23 |
| 9.3 | Successors and Assigns | 24 |
| 9.4 | Assignment or Alienation | 24 |
| 9.5 | Plan Termination | 24 |
| 9.6 | Property Not Transferred | 24 |

**SECTION 10—PARTICIPATION AND SEGREGATION** .......... 24

| | | |
|---|---|---|
| 10.1 | Adoption of Master Trust by Subsidiaries and Affiliates | 24 |
| 10.2 | Segregation from Further Participation | 25 |
| 10.3 | Loss of Qualification | 25 |

**SECTION 11 —ADDITIONAL PROVISIONS** .......... 25

| | | |
|---|---|---|
| 11.1 | Line Item Assets | 25 |
| 11.2 | Non-Fund Assets | 25 |
| 11.3 | Appropriate Action | 26 |
| 11.4 | Governing Law | 26 |
| 11.5 | Sovereign Immunity | 26 |
| 11.6 | Representations | 26 |
| 11.7 | USA PATRIOT Act | 26 |
| 11.8 | Notices | 26 |
| 11.9 | Entire Agreement | 26 |
| 11.10 | Necessary Parties | 27 |
| 10.11 | No Third Party Beneficiaries | 27 |
| 10.12 | Execution in Counterparts | 27 |

**EXHIBIT A-CROSS-TRADING INFORMATION** .......... 1

**EXHIBIT B – FIDUCIARY STATUS** .......... 1

## AMENDED AND RESTATED DEFINED CONTRIBUTION PLAN
## MASTER TRUST AGREEMENT

**AGREEMENT** ("<u>Agreement</u>"), dated as of the latest date set forth on the signature page hereto, among **COLGATE-PALMOLIVE COMPANY** (the "<u>Company</u>"), **COLGATE-PALMOLIVE COMPANY PENSION FUND COMMITTEE** (the "<u>Named Fiduciary</u>") and **THE BANK OF NEW YORK MELLON**, a bank organized under the laws of the state of New York (the "<u>Master Trustee</u>").

### WITNESSETH:

**WHEREAS,** the Company and its subsidiaries or affiliates have adopted one or more employee benefit plans and may in the future adopt additional employee benefit plans intended to meet the requirements of Section 401(a) of the Code or, in the case of the Colgate-Palmolive Puerto Rico Savings and Investment Plan (the "<u>PR Plan</u>"), to qualify under Sections 1081.01(a) and (d) of the Puerto Rico Internal Revenue Code of 2011 (the "<u>PR Code</u>"), for the benefit of the employees therein described (the "<u>Plan</u>," individually, or the "<u>Plans</u>," collectively);

**WHEREAS,** the Company, the Named Fiduciary and the Master Trustee entered into the Colgate-Palmolive Savings & Investment Plan Trust Agreement dated October 22, 2008 (the "Savings & Investment Plan Trust Agreement"), pursuant to which assets are held to provide for the funding of and payment of benefits under the Colgate-Palmolive Savings & Investment Plan (the "Savings & Investment Plan Trust");

**WHEREAS,** the parties desire to restate the terms of the Savings & Investment Plan Trust Agreement as provided herein in order to reflect that the Savings & Investment Plan Trust is a Master Trust and to have the terms of this Agreement supersede the Savings & Investment Plan Trust Agreement; and

**NOW, THEREFORE,** the Company, the Named Fiduciary, and the Master Trustee, each intending to be legally bound, agree to amend and restate the Savings & Investment Plan Trust as follows:

### SECTION 1–ESTABLISHMENT OF MASTER TRUST; INSTRUCTIONS

**1.1**   **<u>Definitions.</u>**   Whenever used in this Agreement, the following words shall have the meanings set forth below:

"<u>Authorized Instructions</u>" shall have the meaning set forth in Section 1.9.

"<u>Authorized Person</u>" shall mean any Person authorized by the Company, the Named Fiduciary or an Investment Manager to give Oral or Written Instructions with respect to the Fund or with respect to foreign exchange, derivative investments or information and transactional web based services provided by the Master Trustee or a BNY Mellon Affiliate. Authorized Persons shall include Persons authorized by an Authorized Person. Authorized Persons, their signatures and the extent of their authority shall be provided by Written Instructions. The Named Fiduciary shall cause the Investment Manager to furnish the Master Trustee with Written Instructions identifying Authorized Persons and their signatures. The Master Trustee may conclusively rely on the authority of such Authorized Persons until it receives a Written Instruction to the contrary.

"BNY Mellon Affiliate" shall mean any direct or indirect subsidiary of The Bank of New York Mellon Corporation.

"Book-Entry System" shall mean the U.S. Federal Reserve/Treasury book-entry system for receiving and delivering securities, its successors and nominees.

"Business Day" shall mean any day on which the Master Trustee and relevant Depositories and Subcustodians are open for business.

"Centralized Functions" shall have the meaning set forth in Section 7.10.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Country Risk Events" shall have the meaning set forth in Section 2.1.

"Customer-Related Data" shall have the meaning set forth in Section 7.10.

"Data Providers" shall mean pricing vendors, analytics providers, brokers, dealers, investment managers, Authorized Persons, Subcustodians, Depositories and any other Person providing Market Data to the Master Trustee.

"Data Terms Website" shall mean *http://www.bnymellon.com/products/assetservicing/vendoragreement.pdf* or any successor website the address of which is provided by the Master Trustee to the Named Fiduciary.

"Depository" shall include the Book-Entry System, the Depository Trust Company, Euroclear, Clearstream Banking S.A., the Canadian Depository System, CLS Bank and any other securities depository, book-entry system or clearing agency (and their respective successors and nominees) authorized to act as a securities depository, book-entry system or clearing agency pursuant to applicable law.

"Designated Party" shall have the meaning set forth in Section 7.1.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Fund" shall mean the account or accounts established pursuant to this Agreement to hold Property.

"Investment Manager" shall mean an investment manager, within the meaning of Section 3(38) of ERISA, with respect to the Fund which has been appointed by the Named Fiduciary pursuant to Section 3.3.

"Losses" shall mean, collectively, losses, costs, expenses, damages, liabilities and claims.

"Market Data" shall mean pricing or other data related to Securities and other assets. Market Data includes but is not limited to security identifiers, valuations, bond ratings, classification data, and other data received from investment managers and others.

"Master Trust" shall mean the trust created by this Master Trust Agreement, and it shall be known as the Colgate-Palmolive Savings & Investment Plans Master Trust.

2

"Named Fiduciary" shall mean individually and collectively, as the case may be, the named fiduciary signing this Agreement and/or any other entity, committee or person having the authority to control and manage the operation and administration of the Plans or the power to manage and control the assets of the Plans.

"Non-Fund Assets" shall have the meaning set forth in Section 11.2.

"Oral Instructions" shall mean instructions expressed in spoken words received by the Master Trustee.

"Operational Losses" shall have the meaning set forth in Section 2.2.

"Person" or "Persons" shall mean any entity or individual.

"Property" shall mean any assets held by the Master Trustee, but shall not include any direct interest in real property, leaseholds or mineral interests.

"Qualifying Employer Securities" shall have the meaning set forth in Section 407(d) of ERISA.

"Required Care" shall have the meaning set forth in Section 2.2.

"Sanctions" shall mean all economic sanctions, laws, rules, regulations, executive orders and requirements administered by any governmental authority of the U.S. (including the U.S. Office of Foreign Assets Control) and the European Union (including any national jurisdiction or member state thereof), in addition to any other applicable authority with jurisdiction over the Master Trust.

"Securities" shall include, without limitation, any common stock and other equity securities, depository receipts, limited partnership and limited liability company interests, bonds, debentures and other debt securities, notes or other obligations, and any instruments representing rights to receive, purchase, or subscribe for the same, or representing any other rights or interests therein (whether represented by a certificate or held in a Depository, with a Subcustodian or on the books of the issuer) that are acceptable to the Master Trustee.

"Subcustodian" shall mean a bank or other financial institution (other than a Depository) that is utilized by the Master Trustee or by a BNY Mellon Affiliate, in its discretion, in connection with the purchase, sale or custody of Securities or cash hereunder.

"Tax Obligations" shall mean taxes, withholding, certification and reporting requirements, claims for exemptions or refund, interest, penalties, additions to tax and other related expenses.

"Third Party Service Provider" shall mean a service provider hired by the Master Trustee to provide or to assist the Master Trustee with providing value-added services requested by the Named Fiduciary or Company.

"Written Instructions" shall mean written communications received by the Master Trustee by S.W.I.F.T., overnight delivery, postal services, facsimile transmission, email, on-line communication system or other method or system, each as specified by the Master Trustee as available for use in connection with the services hereunder.

**1.2** <u>Compliance with Law</u>. The Master Trust is intended to comply with ERISA and to be tax-exempt under Section 501(a) of the Code. The Named Fiduciary represents that the Plans are qualified under Section 401(a) of the Code and shall immediately notify the Master Trustee if a Plan ceases to be so qualified. The Named Fiduciary represents that it maintains and follows procedures to avoid any non-exempt "prohibited transaction" as defined in Section 406 of ERISA.

**1.3** <u>Establishment of Fund</u>. The Named Fiduciary hereby appoints the Master Trustee as trustee for any Property reasonably acceptable to the Master Trustee which the Company may transfer to the Master Trustee's care. The Master Trustee shall hold the Property in trust in accordance with the terms of this Agreement. The Master Trustee hereby accepts such appointment as trustee of such Property, acknowledges that it assumes the duties established by this Agreement and agrees to be bound by the terms contained herein.

**1.4** <u>Contributions</u>. The Master Trustee agrees to accept contributions that are paid to it by the Company (as well as rollover contributions and direct transfers from other qualified retirement plans) in accordance with the terms of this Agreement. Such contributions shall be in cash or in such other form that may be acceptable to the Master Trustee. The Master Trustee shall have no duty to determine or collect contributions under the Plans, and the Named Fiduciary shall be solely responsible therefor. The Master Trustee shall have no responsibility for any Property until it is actually received by the Master Trustee. The Named Fiduciary shall have the duty and responsibility for the determination of the accuracy or sufficiency of the contributions to be made under the Plans, the transmittal of the same to the Master Trustee and compliance with any statute, regulation or rule applicable to contributions prior to the transmittal of the contributions.

**1.5** <u>Exclusive Benefit</u>. The assets of the Master Trust shall be held for the exclusive purposes of providing benefits to participants of a Plan and their beneficiaries and defraying the reasonable expenses of administering a Plan and the Master Trust. Except as may be permitted by law or by the terms of a Plan or this Agreement, at no time prior to the satisfaction of all liabilities with respect to participants and their beneficiaries under a Plan shall any part of the Master Trust be used for or diverted to any purpose other than for the exclusive benefit of the participants and their beneficiaries.

**1.6** <u>Return of Contributions</u>. Notwithstanding any other provision of this Agreement: (i) as contributions made prior to the receipt of an initial determination letter are conditional upon a favorable determination as to the qualified status of each of the Plans under Code Section 401, if a Plan receives an adverse determination with respect to its initial qualification, then any such contribution may be returned to the Company within one year after such determination, provided the application for determination is made by the time prescribed by law; (ii) contributions made by the Company based upon mistake of fact may be returned to the Company within one year of such contribution; (iii) because all contributions to a Plan are conditioned upon their deductibility under the Code if a deduction for all or a portion of a contribution is disallowed, then such contribution may be returned to the Company within one year of the disallowance of such deduction; and (iv) subject to Section 9.5, after all liabilities under a Plan have been satisfied, the remaining assets of the Master Trust may be distributed to the Company if such distribution is provided for in a Plan and does not contravene any provision of applicable law.

In the case of the return of a contribution due to mistake of fact or the disallowance of a

4

deduction, the amount which may be returned is the excess of the amount contributed over the amount that would have been contributed had there not been a mistake or disallowance. Earnings attributable to the excess contributions may not be returned to the Company but losses attributable thereto must reduce the amount to be so returned. Any return of contribution or distribution of assets made by the Master Trustee pursuant to this Section shall be made only upon the direction of the Company or the Named Fiduciary, which shall be responsible for determining whether the conditions of such return or distribution have been satisfied and for the amount to be returned (for the avoidance of doubt, the Master Trustee will cooperate with the Company or Named Fiduciary in determining any gains or losses on the amount to be returned or distributed by providing information reasonably available in its records).

     **1.7**   **Distributions.** The Master Trustee shall make distributions or transfers out of the Fund pursuant to Authorized Instructions. To the extent assets are held in accounts outside the Fund pursuant to Authorized Instructions, the Named Fiduciary shall cause such assets to be held in trust and in accordance with the bonding requirements of Section 412 of ERISA, secure from the claims of all creditors of the Company, the Named Fiduciary or any participant or beneficiary covered by a Plan. Except as directed pursuant to Section 2.8, in making payments to service providers pursuant to Authorized Instructions, the Named Fiduciary acknowledges that the Master Trustee is acting in an administrative or ministerial capacity, and not as the payor, for tax information reporting and withholding purposes.

     **1.8**   **Commingling.** The Master Trustee may commingle the assets attributable to the Plans for which contributions are made under this Agreement if this Agreement is applicable to more than one Plan, and may commingle the Fund with funds of other trusts of similar nature created by the Company for the exclusive benefit of its employees. Where commingling is effected with other trusts maintained by the Company, the combined trust, to the extent that assets are attributable to contributions made under this Agreement, shall be the Fund referred to herein. The Master Trustee shall maintain such records as are necessary in order to maintain a separation of the Fund from the funds of the other trusts maintained by the Company and to separate the assets attributable to each of the Plans for which contributions are made under this Agreement. The Named Fiduciary shall be responsible for causing sufficient records to be maintained to insure that benefits and liabilities payable with respect to each Plan shall be paid from the assets allocable to each such Plan.

     **1.9**   **Authorized Instructions.** The Master Trustee shall be entitled to rely upon any Oral or Written Instructions actually received by the Master Trustee and reasonably believed by the Master Trustee to be from an Authorized Person ("Authorized Instructions"). The Named Fiduciary hereby agrees that the Authorized Person shall have the responsibility for determining that the Authorized Instructions are in accordance with the terms of a Plan and applicable law. The Company and the Named Fiduciary agree that an Authorized Person shall forward to the Master Trustee Written Instructions confirming Oral Instructions by the close of business of the same day that such Oral Instructions are given to the Master Trustee. The Master Trustee may act on such Oral Instructions but is not obligated to do so until Written Instructions are received. The Company and the Named Fiduciary agree that the fact that Written Instructions confirming Oral Instructions are not received or that contrary Written Instructions are received by the Master Trustee shall in no way affect the validity or enforceability of transactions authorized by such Oral Instructions and effected by the Master Trustee.

     **1.10**   **Authentication.** If the Master Trustee receives Written Instructions that appear on their face to have been transmitted by an Authorized Person via (i) facsimile, email, or other

electronic method that is not secure, or (ii) secure electronic transmission containing applicable authorization codes, passwords or authentication keys, the Named Fiduciary understands and agrees that the Master Trustee cannot determine the identity of the actual sender of such Written Instructions and that the Master Trustee shall be entitled to conclusively presume that such Written Instructions have been sent by an Authorized Person and are Authorized Instructions. The Named Fiduciary shall be responsible for ensuring that only Authorized Persons transmit such Written Instructions to the Master Trustee and that all Authorized Persons treat applicable user and authorization codes, passwords and authentication keys with extreme care.

     **1.11**   <u>Security Procedure</u>.  The Named Fiduciary acknowledges and agrees that it is fully informed of the protections and risks associated with the various methods of transmitting Written Instructions to the Master Trustee and that there may be more secure methods of transmitting Written Instructions than the method selected by the sender. The Named Fiduciary agrees that the security procedures, if any, to be followed in connection with a transmission of Written Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances.

     **1.12**   <u>On-Line Systems</u>.  If an Authorized Person elects to transmit Written Instructions through an on-line communication system offered by the Master Trustee, the use thereof shall be subject to any terms and conditions contained in a separate written agreement. If an Authorized Person elects, with the Master Trustee's prior consent, to transmit Written Instructions through an on-line communications service owned or operated by a third party, the Company and the Named Fiduciary each hereby agrees that the Master Trustee shall not be responsible or liable for the reliability or availability of any such service.

     **1.13**   <u>Information Security</u>.  During the term of the Agreement, the Master Trustee will implement and maintain a comprehensive information security program with written policies and procedures designed to protect the confidentiality and integrity of Plans' sensitive information, including non-public personal information of the Plans' participants and/ beneficiaries.  The information security program will contain administrative, technical and physical safeguards, appropriate to the type of information concerned, designed to: (i) maintain the security and confidentiality of such information; (ii) protect against any anticipated threats or hazards to the security or integrity of such information; (iii) protect against unauthorized access to or use of such information that could result in [harm or substantial inconvenience to the Plan's participants and/beneficiaries, and (iv) ensure appropriate disposal of such information.

     **1.14**   <u>Custody of Assets of PR Plan</u>.  The PR Plan is a defined contribution profit sharing plan with a cash or deferred arrangement intended to meet the requirements of Sections 1081.01(a) and (d) of the PR Code, and Title I of ERISA, established for the benefit of the employees in Puerto Rico therein described. The PR Plan is funded through the Colgate-Palmolive Puerto Rico Savings and Investment Plan Trust (the "PR Trust"). The PR Plan and PR Trust are tax-exempt under Section 1081.01(a) of the PR Code, and, pursuant to Section 1022(i)(1) of ERISA, under Section 501(a) of the Code, additionally, the assets of the PR Plan invested under the Master Trust are intended to be assets of an ERISA section 1022(i)(1) plan eligible to participate in a Rev. Rul. 81-100 group trust in accordance with Rev. Rul. 2011-1 as modified by Rev. Rul. 2014-24. The Named Fiduciary represents that the PR Plan is qualified under Section 1081.01(a) of the PR Code and shall immediately notify the Master Trustee if the PR Plan ceases to be so qualified. The assets of the PR Plan in the PR Trust, when held in custody by the Master Trustee (as Custodian pursuant to a duly executed Custody Agreement), may be invested pursuant to Authorized Instructions in investments available under the Master

Trust and commingled with assets of other Plans under the Master Trust, provided the Master Trustee will be able to separately account for the assets of each of the Plans invested under the Master Trust. The Master Trustee shall not serve as a co-trustee with respect to the PR Trust.

## SECTION 2 – MASTERTRUST SERVICES

**2.1**      **Holding Securities.**  Subject to the terms hereof, the Named Fiduciary hereby authorizes the Master Trustee to hold any Securities in registered form in the name of the Master Trustee or one of its nominees. Securities held hereunder shall be segregated on the Master Trustee's books and records from the Master Trustee's own property. The Master Trustee shall be entitled to utilize Subcustodians and Depositories in connection with its performance hereunder. Securities and cash held through Subcustodians shall be held subject to the terms and conditions of the Master Trustee's or a BNY Mellon Affiliate's agreements with such Subcustodians. Securities and cash deposited by the Master Trustee in a Depository will be held subject to the rules, terms and conditions of such Depository. Subcustodians may hold Securities in Depositories in which such Subcustodians participate. Unless otherwise required by local law or practice or a particular subcustodian agreement, Securities deposited with Subcustodians will be held in a commingled account in the name of the Master Trustee or a BNY Mellon Affiliate for its clients. The Master Trustee shall identify on its books and records the Securities and cash belonging to the Fund, whether held directly or indirectly through Depositories or Subcustodians. In no event shall the Master Trustee be liable for any Losses to the extent they arise out of the holding of Securities or cash in any particular country, including but not limited to, Losses resulting from nationalization, expropriation or other governmental actions; regulation of the banking or securities industry; exchange or currency controls or restrictions, devaluations or fluctuations or currency redenomination; availability of Securities or cash or market conditions which prevent the transfer of property or the execution of Securities transactions or affect the value of property ("Country Risk Events").

**2.2**      Subcustodians.   The Master Trustee shall exercise reasonable care in the selection or retention, monitoring and continued use of Subcustodians in light of prevailing rules, practices, procedures and circumstances in the relevant market (the "RequiredCare").

With respect to any Losses incurred by the Master Trust, the Named Fiduciary or any other person as a result of the acts or the failure to act by any Subcustodian ("Operational Losses," which specifically excludes Losses arising out of or relating to Country Risk Events), the Master Trustee shall be liable for:

a.       Operational Losses with respect to Securities or cash held by the Master Trustee with or through a BNY Mellon Affiliate; and

b.       Operational Losses with respect to Securities or cash held by the Master Trustee with or through a Subcustodian (other than a BNY Mellon Affiliate) to the extent that such Operational Losses were caused by failure on the part of the Master Trustee to exercise Required Care.

With respect to all other Operational Losses not covered by clauses (a) and (b) above, the Master Trustee shall take appropriate action to recover Operational Losses from such Subcustodian and Master Trustee's sole liability shall be limited to amounts recovered from such Subcustodian (exclusive of costs and expenses incurred by the Master Trustee).

In addition, the Master Trustee shall be liable for repayment to the Master Trust of cash credited to the Fund and credited to any relevant cash account at the Subcustodian that the Master Trustee is not able to recover from the Subcustodian (other than as a result of Country Risk Events).

2.3    **Depositories.**    The Master Trustee shall have no liability whatsoever for the action or inaction of any Depository or for any Losses resulting from the maintenance of Securities with a Depository.  The Master Trustee shall be liable to repay cash credited to the Fund and credited to any relevant account at such Depository (other than as a result of Country Risk Events).

2.4    **Agents.**    The Master Trustee may appoint agents, including BNY Mellon Affiliates, on such terms and conditions as it deems appropriate to perform its services hereunder.  Except as otherwise specifically provided herein, no such appointment shall discharge the Master Trustee from its obligations or liabilities hereunder.

2.5    **Master Trustee Actions without Direction.**    With respect to Property, the Master Trustee shall:

a.    Receive income and other payments due to the Fund;

b.    Carry out any exchanges of Securities or other corporate actions not requiring discretionary decisions;

c.    Facilitate access by the Named Fiduciary or its designee to ballots or online systems to assist in the voting of proxies received for eligible positions of Securities held in the Fund (excluding bankruptcy matters);

d.    Forward to the Named Fiduciary or its designee information (or summaries of information) that the Master Trustee receives from Depositories or Subcustodians concerning Securities in the Fund (excluding bankruptcy matters);

e.    Forward to the Named Fiduciary or its designee an initial notice of bankruptcy cases relating to Securities held in the Fund and a notice of any required action related to such bankruptcy cases as may be received by the Master Trustee.  No further action or notification related to the bankruptcy case shall be required;

f.    Make, execute and deliver any and all documents, agreements or other instruments in writing as necessary or desirable for the accomplishment of any of the powers of this Agreement;

g.    Generally take all action, whether or not expressly authorized which the Master Trustee may deem necessary or desirable for the fulfillment of its duties hereunder;

h.    Endorse for collection checks, drafts or other negotiable instruments received on behalf of the Fund; and

i.    Have the authority to deposit cash in accounts bearing interest at a reasonable rate in the banking department of the Master Trustee or an affiliated banking organization.

j.      The powers described in this Section 2.5 may be exercised by the Master Trustee with or without Authorized Instructions, but where the Master Trustee acts on Authorized Instructions, the Master Trustee shall be fully protected as described in Section 1.9.

2.6      **Master Trustee Actions with Direction**.  The Master Trustee shall take the following actions in the administration of the Fund only pursuant to Authorized Instructions:

a.      Settle purchases and sales of Securities and process other transactions, including, without limitation, free receipts and deliveries;

b.      Purchase or sell, write or issue, puts, calls, or other options, covered or uncovered, enter into financial futures contracts, forward placement contracts and standby contracts, swaps, synthetic GICs and other derivative investments, and in connection therewith, custody and pledge assets of the Fund;

c.      Settle transactions in foreign exchange or foreign exchange contracts, provided that the Master Trustee may establish rules or limitations concerning any foreign exchange facility made available;

d.      Deliver Securities in the Fund if an Authorized Person advises the Master Trustee that the Named Fiduciary has entered into a separate securities lending agreement, provided that the Named Fiduciary execute such agreements as the Master Trustee may require in connection with such arrangements;

e.      Settle investments in any collective investment fund, including a collective investment fund maintained by the Master Trustee or a BNY Mellon Affiliate and appoint agents and sub-trustees.  To the extent that any investment is made in any such collective investment fund, the terms of the collective trust indenture shall solely govern the investment duties, responsibilities and powers of the trustee of such collective investment fund and such terms, responsibilities and powers shall be incorporated herein by reference and shall be a part of this Agreement.  For purposes of valuation, the value of the interest maintained by the Fund in such collective investment fund shall be the fair market value of the collective investment fund units held, determined in accordance with generally recognized valuation procedures.  The Named Fiduciary expressly understands and agrees that any such collective investment fund may provide for the lending of its securities by the collective investment fund trustee and that such collective investment fund trustee will receive compensation for the lending of securities that is separate from any compensation of the Master Trustee hereunder, or any compensation of the collective investment fund trustee for the management of such fund.  The Master Trustee is authorized to invest in a collective fund which invests in The Bank of New York Mellon Corporation stock in accordance with the terms and conditions of the Department of Labor Prohibited Transaction Exemption 95-56 (the "Exemption") granted to Mellon Bank, N.A. and its affiliates and to use a cross-trading program in accordance with the Exemption.  The Named Fiduciary acknowledges receipt of the notice entitled "Cross-Trading Information," a copy of which is attached to this Agreement as Exhibit A;

f.      Lend the assets of the Fund to participants of the Plans.  The Named Fiduciary shall have full and exclusive responsibility for loans made to participants, including, without limitation, full and exclusive responsibility for the following: development of procedures and documentation for such loans as required by applicable law; acceptance of loan applications; approval of loan applications; acting as agent for the physical custody and safekeeping of the

9

promissory notes and other loan documents; performing necessary and appropriate recordkeeping and accounting functions with respect to loan transactions; enforcement of promissory note terms, including, but not limited to, directing the Master Trustee to take specified actions; and maintenance of accounts and records regarding interest and principal payments on notes. The Master Trustee shall not in any way be responsible for holding or reviewing such documents, records and procedures and shall be entitled to rely upon such information as is provided by the Named Fiduciary or its sub-agent or recordkeeper without any requirement or responsibility to inquire as to the completeness or accuracy thereof;

        g.      Institute suits or legal proceedings subject to the Master Trustee's receipt of satisfactory indemnity for fees and expenses; and

        h.      Take any other action as necessary to perform hereunder as directed pursuant to Authorized Instructions.

    **2.7**    **Foreign Exchange Transactions**. Subject to applicable law, any foreign exchange transaction effected by the Master Trustee in connection with this Agreement may be entered with the Master Trustee or a BNY Mellon Affiliate acting as a principal or otherwise through customary channels. The Investment Manager or Named Fiduciary may issue standing Written Instructions with respect to foreign exchange transactions, but the Master Trustee may establish rules or limitations concerning any foreign exchange facility made available to the Fund. With respect to foreign exchange transactions done through The Bank of New York Mellon's Global Markets FX Desk (FX Desk"), FX Desk is acting as a principal counterparty on its own behalf and is not acting as a fiduciary or agent for, or in connection with, the Master Trust, the Named Fiduciary, or an Investment Manager.

    **2.8**    **Distribution Services**. The Named Fiduciary directs the Master Trustee and the Master Trustee shall, as part of its services under this Agreement, provide benefit payment disbursement services for the Company's Plans. Benefit payment disbursement services shall include the creation and furnishing of checks, direct deposits or wire transfers for participant benefit distributions as instructed by the Plans' recordkeeper(s) and the creation and furnishing of customary tax forms, including but not limited to the IRS Forms 1099-R and 1042-S, as appropriate, associated with such participant benefit distributions and any additional disbursement services agreed to between the parties.

## SECTION 3–INVESTMENT OF THE FUND

    **3.1**    **Establishment of Accounts**. The Named Fiduciary shall direct the Master Trustee to establish on its books and records accounts sufficient to accommodate investment options.

    **3.2**    **Participant Direction**.

        a.      If the Named Fiduciary advises the Master Trustee that any Plan permits each participant to direct the investment of assets allocated to that participant's account, then the Master Trustee shall invest the assets in accordance with the directions as received, aggregated and communicated to the Master Trustee by an Authorized Person or as communicated by or on behalf of a participant pursuant to a self-directed account agreement.

        b.      (i) The Named Fiduciary represents, warrants and covenants to the Master Trustee that it will operate the Plans or the applicable part of any Plan at all times during the

term of this Agreement as a plan within the meaning of Section 404(c) of ERISA and in compliance with all of the requirements set forth in the regulation promulgated under Section 404(c) of ERISA (a "404(c) plan"); (ii) based upon the representation, warranty and covenant set forth above, the Master Trustee shall be entitled to rely on participants' directions, shall be under no duty to determine whether participants' directions are in accordance with the provisions of the Plans or applicable law, and shall have no liability and shall be fully indemnified by the Company for any action taken in accordance with, or any failure to act in the absence of, participants' directions; and (iii) the Company shall indemnify and hold harmless the Master Trustee from all Losses, including reasonable attorneys' fees and expenses, incurred by the Master Trustee as a result of any breach of the representation, warranty and covenant set forth in this Section.

        c.     If for any reason a Plan does not qualify as a 404(c) plan, each participant shall be a "named fiduciary" of such Plan with respect to the investment of assets in his or her account. In such event, the Master Trustee shall have no liability and shall be fully indemnified by the Company for any action taken in accordance with, or any failure to act in the absence of, participants' directions that are in accordance with the terms of such Plan and which are not contrary to the provisions of ERISA.

        d.     The indemnification provisions set forth in this Section shall survive the termination of this Agreement.

    **3.3**    **Appointment of Investment Managers.** The Named Fiduciary has the authority and responsibility to manage the assets of the Fund. In carrying out this responsibility, the Named Fiduciary may appoint (and remove) one or more Investment Managers, which may include the Master Trustee or a BNY Mellon Affiliate, if and to the extent set forth in a separate agreement executed by the Named Fiduciary and such BNY Mellon Affiliate. The Master Trustee shall not be responsible under this Agreement, directly or indirectly, for the investment or reinvestment of the assets of the Fund. If the Named Fiduciary appoints an Investment Manager, the Master Trustee shall place in a separate subaccount those assets over which the Investment Manager has discretion and control.

    **3.4**    **Qualifying Employer Securities.**    Investments in Qualifying Employer Securities shall be subject to the following:

        a.     The Named Fiduciary represents that each of the Plans is an "eligible individual account plan" under Section 407(d)(3) of ERISA and may be treated as such with respect to the acquisition and holding of Qualifying Employer Securities.

        b.     The Named Fiduciary represents, warrants and covenants that all employer securities now or hereafter held in the Master Trust are, and shall at all times be, Qualifying Employer Securities.

        c.     The Named Fiduciary shall be responsible for determining the prudence under ERISA of offering Qualifying Employer Securities as an investment option and of acquiring, continuing to hold and selling Qualifying Employer Securities. The investment purpose of the Qualifying Employer Securities account is to invest 100% in Qualifying Employer Securities subject to a liquidity buffer designed to provide for trading on a daily basis.

d.      Subject to the provisions of subsection (e) below, the Master Trustee shall purchase and sell Qualifying Employer Securities in accordance with such procedures and guidelines as agreed to between the parties.

e.      Pursuant to Authorized Instructions, the Master Trustee shall purchase or sell Qualifying Employer Securities on the open market or from or to the Company. In addition, the Company may contribute Qualifying Employer Securities in lieu of cash to the Fund. In the event that the Named Fiduciary directs the Master Trustee to use a particular broker or dealer to effect the purchase or sale of Qualifying Employer Securities, the Named Fiduciary shall represent to the Master Trustee that such direction (i) is for the exclusive benefit of participants and beneficiaries of the Plan, and (ii) shall not constitute, or cause the Fund to be engaged in, a "prohibited transaction" as defined in Section 406 of ERISA for which an exemption does not apply. In the event the Master Trustee is directed to purchase or sell Qualifying Employer Securities from or to the Fund, or the Company contributes Qualifying Employer Securities in lieu of cash to the Fund, such purchase, sale or transfer shall be for "adequate consideration" as defined in Section 3(18) of ERISA and no commission shall be charged.

f.      The Named Fiduciary represents, warrants and covenants that all of the required registration statements relating to shares of Qualifying Employer Securities and other interests which may be issued under the Plan have been filed and will continue to be filed with the Securities and Exchange Commission and with all applicable state agencies or authorities. The Named Fiduciary acknowledges that it is and shall be responsible for, and that the Master Trustee shall not be responsible for, the preparation and filing of such registration statements or for the accuracy of statements contained therein, or for preparing or filing any other reports, statements or filings required under federal or state securities laws with respect to the Fund's investment in Qualifying Employer Securities, provided that the Master Trustee shall, upon the reasonable request of the Named Fiduciary or its designee, provide any records or information under its control that the Named Fiduciary or its designee may need to prepare such filings.

g.      The Named Fiduciary shall use commercially reasonable efforts to provide the Master Trustee with a copy of all proxy solicitation materials proposed to be sent to stockholders at least seven (7) days before the materials are sent to stockholders or if the issuer of Qualifying Employer Securities held in the Fund files preliminary proxy solicitation materials with the Securities and Exchange Commission, then the Named Fiduciary shall cause a copy of all materials to be simultaneously sent to the Master Trustee. The Master Trustee, in its discretion, may prepare or modify any voting instruction form to be sent to participants. Except as otherwise agreed between the Company and the Master Trustee, the Company shall cause a copy of the notice of stockholder's meeting with proxy solicitation materials to be sent or otherwise provided to each participant for whose account Qualifying Employer Securities are credited along with a voting instruction form. The Named Fiduciary shall provide the Master Trustee with a copy of all material provided to participants and shall certify to the Master Trustee that the materials have been mailed or otherwise provided to each such participant.

The voting instruction form shall be returnable to the Master Trustee or the designated tabulator. Each participant shall be entitled to direct the Master Trustee by means of the voting instruction form as to the voting of shares (including fractional interests in shares) of Qualifying Employer Securities credited to such participant's account (both vested and nonvested). Upon timely receipt of the voting instruction form, the Master Trustee shall vote the shares of Qualifying Employer Securities as instructed. Instructions received by the Master Trustee from participants shall be held by the Master Trustee in strict confidence and, except as

may be required by law, shall not be divulged or released to any person including officers or employees of the Company or the Named Fiduciary; provided, however, that the Master Trustee may advise the Company, upon request, of the total number of votes that have been cast with respect to a particular issue. If the Company or the Named Fiduciary selects the tabulator, then the Company or the Named Fiduciary agrees to cause the tabulator to provide to the Master Trustee an agreement to keep confidential the instructions received from participants. The Master Trustee shall not make recommendations to participants on whether to vote or how to vote shares of Qualifying Employer Securities. The Master Trustee shall vote the shares of Qualifying Employer Securities held in the Plans' suspense account, all shares released from the Plans' suspense account but not yet allocated to any participant's account, and all Qualifying Employer Securities allocated to a participant's account which are not voted by the participant, because the participant has not directed (or not timely directed) the Master Trustee as to manner in which such Qualifying Employer Securities are to be voted, in the same proportion as those shares of Qualifying Employer Securities for which the Master Trustee has received proper direction on such matter. The Master Trustee shall not be obligated to solicit a response from participants from whom it has not received instructions.

h.     In the event of a tender or exchange offer for any Qualifying Employer Securities held in the Fund, the Named Fiduciary shall cause the Master Trustee to be provided with a copy of all tender or exchange offer materials to be sent to stockholders. The Master Trustee, in its discretion, may prepare or modify any tender or exchange instruction form to be sent to participants. Except as otherwise agreed between the Company and the Master Trustee, the Company shall notify the participants of the tender or exchange offer and distribute all information to be sent to stockholders to each participant for whose account Qualifying Employer Securities are credited, along with a tender or exchange instruction form. The Named Fiduciary shall provide the Master Trustee with a copy of all materials provided to participants and shall certify to the Master Trustee that the materials have been mailed or otherwise provided to each such participant.

The tender or exchange instruction form shall be returnable to the Master Trustee or the designated tabulator. Each participant shall be entitled to direct the Master Trustee by means of the tender or exchange instruction form as to the tender or exchange of shares (including fractional interest in shares) of Qualifying Employer Securities credited to such participant's account (both vested and nonvested).

Upon timely receipt of the tender or exchange instruction form, the Master Trustee shall act with respect to Qualifying Employer Securities as instructed. Instructions received by the Master Trustee from participants shall be held by the Master Trustee in strict confidence, and, except as may be required by law, shall not be divulged or released to any person including officers or employees of the Company or the Named Fiduciary; provided, however, that the Master Trustee may advise the Company, upon request, of the total number of shares of Qualifying Employer Securities that have been tendered or exchanged. If the Company or the Named Fiduciary selects the tabulator, then the Company or the Named Fiduciary agrees to cause the tabulator to provide to the Master Trustee an agreement to keep confidential the instructions received from participants. The Master Trustee shall not make recommendations to participants on whether to tender or exchange. The Master Trustee shall not tender or exchange shares of Qualifying Employer Securities credited to a participant's account for which it has not received instructions from the participant. The Master Trustee shall not be obligated to solicit a response from participants from whom it has not received instructions. The Master Trustee shall tender or exchange that number of shares of Qualifying Employer Securities not credited to

participants' accounts which is determined (after giving effect to the withdrawal of any shares of Qualifying Employer Securities before the expiration of the offer or any earlier date set by the Master Trustee) by multiplying the total number of shares of Qualifying Employer Securities not credited to participants' accounts by a fraction of which the numerator is the number of shares of Qualifying Employer Securities credited to participants' accounts for which the Master Trustee has received instructions from participants to tender or exchange and of which the denominator is the total number of shares of Qualifying Employer Securities credited to participants' accounts.

        i.      For purposes of this Section, the number of shares of Qualifying Employer Securities deemed "credited" to a participant's account shall be determined as of the last preceding valuation date for which an allocation has been completed and Qualifying Employer Securities have actually been credited to participants' accounts.

        j.      All costs incurred by the Master Trustee in handling proxy and tender or exchange offer matters, including without limitation all costs associated with the printing and mailing of participant instruction forms and other materials, tabulation fees and attorneys' fees, shall be expenses of the Fund or the Plan Sponsor within the meaning of Section 8.5 of this Agreement.

        k.      To the extent that a Plan does not qualify as a 404(c) plan, each participant (or, in the event of his or her death, his or her beneficiary) is, for purposes of this Section, a "named fiduciary", within the meaning of ERISA, with respect to the Qualifying Employer Securities held on his or her behalf. In addition, such participant (or, in the event of his or her death, his or her beneficiary) is hereby expressly appointed a Named Fiduciary including the unvested and/or unresponded shares.

### SECTION 4–CORPORATE ACTIONS

**4.1**    **Notification.** The Master Trustee shall notify the Named Fiduciary or its designee of rights or discretionary corporate actions as promptly as practicable under the circumstances, provided that the Master Trustee has actually received notice of such right or discretionary corporate action from the relevant Subcustodian or Depository. Without actual receipt of such notice, the Master Trustee shall have no liability for failing to so notify the Named Fiduciary.

**4.2**    **Direction.** Whenever there are voluntary rights that may be exercised or alternate courses of action that may be taken by reason of the Fund's ownership of Securities, the Named Fiduciary or its designee shall be responsible for making any decisions relating thereto and for directing the Master Trustee to act. In order for the Master Trustee to act, it must receive Authorized Instructions using the Master Trustee generated form or clearly marked as instructions, addressed as the Master Trustee may from time to time request, by such time as the Master Trustee shall advise the Named Fiduciary or its designee. If the Master Trustee does not receive Authorized Instructions by such deadline, the Master Trustee shall not be liable for failure to take any action relating to or to exercise any rights conferred by such Securities.

**4.3**    **Partial Redemptions, Payments, Etc.** The Master Trustee shall promptly advise the Named Fiduciary or its designee upon its notification of a partial redemption, partial payment or other action with respect to a Security affecting fewer than all such Securities held within the Fund. If the Master Trustee, any Subcustodian or Depository holds any Securities affected by

one of the events described, the Master Trustee, the Subcustodian or Depository may select the Securities to participate in such partial redemption, partial payment or other action in any non-discriminatory manner that it customarily uses to make such selection.

## SECTION 5 – SETTLEMENT OF TRADES

**5.1** **Trading Instructions.** An Authorized Person shall deliver or cause to be delivered to the Master Trustee all information necessary for the Master Trustee to settle purchases or sales. For the purpose of settling purchases of Securities, an Authorized Person shall cause the Master Trustee to be provided with sufficient immediately available funds for all such transactions by such time and date as conditions in the relevant market dictate.

**5.2** **Contractual Settlement and Income.**

In accordance with the Master Trustee's standard operating procedures, the Master Trustee may, as a matter of bookkeeping convenience, credit the Fund with the proceeds from the sale, redemption or other disposition of Securities or interest, dividends or other distributions payable on Securities prior to its actual receipt of final payment therefor. All such credits shall be conditional until the Master Trustee's actual receipt of final payment and may be reversed by the Master Trustee to the extent that final payment is not received. Payment with respect to a transaction will not be "final" until the Master Trustee shall have received immediately available funds that under applicable local law, rule or practice are irreversible and not subject to any security interest, levy or other encumbrance, and that are specifically applicable to such transaction.

**5.3** **Trade Settlement.** Transactions will be settled using practices customary in the jurisdiction or market where the transaction occurs. The Named Fiduciary understands that when the Master Trustee is instructed to deliver Securities against payment, delivery of such Securities and receipt of payment therefor may not be completed simultaneously. The Named Fiduciary assumes, on behalf of the Master Trust, full responsibility for all risks involved in connection with the Master Trustee's delivery of Securities pursuant to Authorized Instructions in accordance with local market practice.

## SECTION 6 – DEPOSITS AND ADVANCES

**6.1** **Deposits.** The Master Trustee may, to the extent not prohibited by ERISA, hold cash in the Fund or may arrange to have such cash held by a BNY Mellon Affiliate or Subcustodian, or with a Depository. Where cash is on deposit with the Master Trustee, a Subcustodian, a BNY Mellon Affiliate or a Depository, it will be subject to the terms of this Agreement and such deposit terms and conditions as may be issued by such entity from time to time.

**6.2** **Sweep.** Cash may be swept as directed by the Named Fiduciary or an Investment Manager to investment vehicles offered by the Master Trustee or to other investment vehicles. Cash may be uninvested when it is received or reconciled to an account in the Fund after the deadline to be swept into a target vehicle, or when held for short periods of time related to transaction settlements. The Named Fiduciary acknowledges that, as part of the Master Trustee's compensation, the Master Trustee will earn interest on cash balances held by the Master Trustee, including disbursement balances and balances arising from purchase and sale transactions, as provided in the Master Trustee's indirect compensation disclosures.

**6.3**   <u>Overdrafts and Indebtedness</u>.  The Master Trustee may, in its sole discretion and to the extent not prohibited by ERISA, advance funds in any currency hereunder.  If an overdraft occurs in the Fund (including, without limitation, overdrafts incurred in connection with the settlement of securities transactions, funds transfers or foreign exchange transactions) or if the Master Trust is for any other reason indebted to the Master Trustee, the Master Trustee shall be entitled, and the Named Fiduciary authorizes the Master Trustee, to collect from the Master Trust the amount of the advance, overdraft or indebtedness, plus accrued interest at a rate then charged by the Master Trustee to its institutional trust clients in the relevant currency.

**6.4**   <u>Securing Repayment</u>.  In order to secure repayment of the Master Trust's obligations (whether or not matured) to the Master Trustee, the Named Fiduciary on behalf of the Master Trust hereby pledges and grants to the Master Trustee a continuing first lien and security interest in, and right of setoff against, all of the Plans' and Master Trust's right, title and interest in and to the Fund and the Securities, money and other Property now or hereafter held in the Fund (including proceeds thereof); provided, that the Named Fiduciary does not grant the Master Trustee a security interest in any Securities issued by an affiliate of the Master Trustee (as defined in Section 23A of the Federal Reserve Act).  The Named Fiduciary represents that the Master Trust owns the Securities in the Fund free and clear of all liens, claims, security interests, and the first lien and security interest granted therein shall be subject to no setoffs, counterclaims, or other liens prior to or on a parity with it in favor of any other party (other than specific liens granted preferred status by statute).  The Named Fiduciary shall take any additional steps required to assure the Master Trustee of such priority security interest, including notifying third parties or obtaining their consent.  The Master Trustee shall be entitled to collect from the Fund sufficient cash for reimbursement, and if such cash is insufficient, to sell the Securities in the Fund to the extent necessary to obtain reimbursement.  In this regard, the Master Trustee shall be entitled to all the rights and remedies of a pledgee and secured creditor as if the Master Trust is in default under applicable laws, rules or regulations as then in effect.

## SECTION 7–TAXES, REPORTS, RECORDS AND OTHER MATTERS

**7.1**   <u>General Tax Responsibilities</u>.

a.   The Master Trustee shall prepare and file any U.S. federal tax return or report and pay any amounts due with respect to such U.S. return or report (based on information in the Master Trustee's possession and to the extent funded) as required by law for a trustee, subject to Section 1.7 hereof, unless the Named Fiduciary otherwise directs in writing.  In addition to the foregoing, the Master Trustee shall provide such other services with respect to Tax Obligations as [provided in Section 2.8 or as requested by the Named Fiduciary and agreed to by the Master Trustee in writing.  Except as otherwise provided in Section 2.8 and this Section 7, the Master Trustee shall have no obligation or liability with respect to Tax Obligations, including, without limitation, any obligation to file or submit returns or reports with any state, foreign or other taxing authorities.

b.   The Master Trustee may consult with and rely upon the Named Fiduciary in all matters pertaining to Tax Obligations.  The Named Fiduciary shall provide and/or shall cause any party it designates ("Designated Party") to provide information necessary for the Master Trustee to fulfill its obligations with respect to Tax Obligations in a timely manner.

c.   To the extent the Named Fiduciary desires a Designated Party to undertake responsibilities with respect to Tax Obligations, including those Tax Obligations

imposed on the Master Trustee under any law, the Named Fiduciary shall inform the Master Trustee in writing as to which Designated Party or Parties have been delegated such responsibilities and should receive information from the Master Trustee. The Master Trustee shall provide to the Named Fiduciary or a Designated Party on a timely basis any information in the Master Trustee's possession requested by the Named Fiduciary or a Designated Party to fulfill its responsibilities with respect to a Tax Obligation. The Named Fiduciary shall be solely responsible to cause the Designated Party to fulfill such responsibilities. The Company shall indemnify the Master Trustee with respect to any liability concerning Tax Obligations resulting from the actions or failures to act of the Company, Named Fiduciary or the Designated Party.

7.2 **Specific Tax Responsibilities.**

a. Upon receipt of sufficient information, the Master Trustee shall make reasonable efforts to file claims for exemptions or refunds with respect to withheld foreign (non-United States) taxes in instances in which such claims are appropriate.

b. The Master Trustee shall provide the Named Fiduciary or a Designated Party any data or materials received by the Master Trustee concerning potential unrelated business taxable income. However, the Master Trustee shall have no responsibility to independently collect data or informational materials with respect to unrelated business taxable income received by the Master Trust or, unless otherwise agreed to by the Named Fiduciary and the Master Trustee in writing, to prepare and file any forms to report unrelated business taxable income to the Master Trust. Pursuant to Authorized Instructions, the Master Trustee shall pay from the Master Trust the amount of any unrelated business income tax due, as determined by the Named Fiduciary or a Designated Party.

7.3 **Pricing and Other Data.** In providing Market Data related to the Fund in connection with this Agreement, the Master Trustee is authorized to use Data Providers. The Master Trustee may follow Authorized Instructions in providing pricing or other Market Data, even if such instructions direct the Master Trustee to override its usual procedures and Market Data sources. The Master Trustee shall be entitled to rely without inquiry on all Market Data (and all Authorized Instructions related to Market Data) provided to it, and the Master Trustee shall not be liable for any Losses incurred as a result of Market Data that contains errors or that is inaccurate or incomplete. The Named Fiduciary acknowledges that certain pricing or valuation information may be based on calculated amounts rather than actual market transactions and may not reflect actual market values, and that the variance between such calculated amounts and actual market values may be material. The Master Trustee shall not be required to inquire into the pricing of any Securities or other assets even though the Master Trustee may receive different prices for the same Securities or assets. Market Data may be the intellectual property of the Data Providers, which may impose additional terms and conditions upon the Named Fiduciary's use of the Market Data. The additional terms and conditions can be found on the Data Terms Website. The Named Fiduciary agree to those terms as they are posted in the Data Terms Website from time to time. In the event of a change to the Data Terms Website a notification will be placed in the Workbench Message Center. Certain Third Party Service Providers may not utilize an Authorized Person's directed price due to system constraints or differing data sources. Performance measurement and analytic services may use different data sources than those used by the Master Trustee to provide Market Data for the Fund, which may result in differences between custodial reports and performance measurement and analytic reports.

17

7.4    <u>Net Asset Value Calculation Service</u>.    The Named Fiduciary hereby also engages the Master Trustee as a service provider to perform a calculation service. This Section 7.4 shall supersede the Net Asset Value Calculation Procedures established by the Company, the Named Fiduciary and the Master Trustee effective October 22, 2008.

a.    <u>Fund Value</u>.    The Master Trustee agrees to provide to the Named Fiduciary, its service providers or its agents for each Valuation Date (defined below) a net asset value calculation service for each portfolio (each such portfolio referred to as a "<u>Fund</u>" in this Section) designated by the Named Fiduciary and agreed to by the Master Trustee. "<u>Business Day</u>" shall mean (i) in the case of daily valued Funds, any day that the New York Stock Exchange is open for trading, and (ii) in all other cases, any day that the Master Trustee is open for business. Each day on which any such value is calculated is referred to as a "<u>Valuation Date</u>." A Valuation Date shall be any such Business Day or Business Days as the Named Fiduciary and the Master Trustee shall agree upon from time to time.

b.    <u>Total Net Asset Value</u>.    The Total Net Assets ("<u>TNA</u>") of a Fund on a Valuation Date shall equal the aggregate value of the assets of a Fund less the value of the accrued liabilities of a Fund. The TNA of a Fund shall be calculated in accordance with generally recognized valuation procedures. The Master Trustee shall obtain and rely upon Market Data, as otherwise provided under this Agreement, and shall be without liability or responsibility for any loss occasioned by such reliance.

c.    <u>Net Asset Value Calculation; Participating Investor Units</u>.    A Fund shall be divided into units of participation ("<u>Units</u>"). The dollar value of one Unit of a Fund shall be called the Net Asset Value ("<u>NAV</u>"). The initial NAV shall be $10.00 unless otherwise directed by the Named Fiduciary. Thereafter, the NAV shall be calculated by dividing the TNA of a Fund by the number of Units outstanding on a Valuation Date as calculated by the Master Trustee or as reported to the Master Trustee by the Named Fiduciary, its service providers or its agents or other Authorized Person. Provided that the TNA of a Fund on a Valuation Date and the total value of each participant's interest in a Fund on such Valuation Date remain the same, the Named Fiduciary may direct the Master Trustee to increase or decrease the total number of outstanding Units of a Fund with a corresponding change in the NAV of a Fund.

d.    <u>Reconciliation; TNA and/or NAV</u>.

(i)    The Named Fiduciary shall assist, and shall cause the Plans' Investment Managers, service providers and agents to assist, with the reconciliation of a Fund's investment transactions and asset and liability positions. In the event that the Master Trustee receives information from the Named Fiduciary or its Investment Managers, service providers, agents or other Authorized Person, the Master Trustee shall be fully protected when relying upon and acting in accordance with, any such information (including, but not limited to, underlying investment vehicle values and information concerning purchases and sales or other information necessary for the Master Trustee to calculate any such TNA or NAV).

(ii)    The Master Trustee shall transmit or otherwise make available to the Named Fiduciary or the Named Fiduciary's service provider or agent for each Valuation Date the TNA and/or NAV of such Fund, and the Units outstanding (as applicable), as of the Valuation Date.

e.    <u>Restatement of NAV</u>.

(i)    In the event that there has been a misstatement of NAV calculated by the Master Trustee as a part of its NAV calculation service with respect to any Valuation Date, irrespective of the nature or cause of the event or error resulting in a misstatement of the TNA and/or NAV, the following shall apply: (1) the Master Trustee shall not be required to restate the NAV and participant accounts will not otherwise be corrected if the discrepancy in the stated NAV to the corrected NAV is less than one-half of one percent (.005 or 50 basis points); and (2) the Master Trustee shall restate the NAV and participant accounts shall be corrected if the NAV of a Fund is incorrect and the discrepancy is equal to or greater than one-half of one percent (.005 or 50 basis points) of the correct NAV, but only to the extent that individual participant accounts were harmed or enriched in excess of $50.00 per participant account.

(ii)    In the event of a purchase of Units of a Fund by a participant associated with a misstated NAV, irrespective of the nature or cause of the event or error resulting in a misstated NAV, and in the event that participant accounts are to be corrected pursuant to Section e(i)(3) above, each affected participant's account shall be corrected by effecting a purchase of Units of the relevant Fund using the corrected NAV and the dollar amount equal to the dollar amount associated with the purchase of Units at the misstated NAV.

(iii)    In the event of a sale of Units of a Fund by a participant associated with a misstated NAV, irrespective of the nature or cause of the event or error resulting in a misstated NAV, and in the event that participant accounts are to be corrected pursuant to Section e(i)(3) above, each participant's account shall be corrected, to the extent practicable, by using the corrected NAV and effecting a sale of Units of the relevant Fund as may be necessary to generate proceeds equal to the dollar amount of proceeds distributed to or otherwise transferred for the benefit of each affected participant.  In the event that there are insufficient Units of such Fund for an affected participant to enable any such corrected sale transaction to be effected, the Named Fiduciary acknowledges that such participant shall have received an amount in excess of the amount to which such participant was entitled and the Named Fiduciary shall undertake prudent actions to cause each such participant to repay to such Fund any such amount distributed to or otherwise transferred for the benefit of each such participant in excess of the amount to which each such participant was entitled had the sale proceeds been calculated at the corrected NAV.

(iv)    The administrative costs of making corrections to the NAV and/or participant accounts shall be borne by the Fund, to the extent permitted by applicable law, and otherwise borne by the Company or other responsible person(s), provided that the Master Trustee shall not be a responsible person except to the extent that the Master Trustee has breached its standard of care under §8.1 of this Agreement.   In the event that the Master Trustee is responsible for all or any portion of the cost of any such correction, the Master Trustee's sole responsibility shall be to pay the lesser of (1) the cost of reimbursing the relevant Fund to negate the impact on such Fund of transactions effected based upon a misstated NAV or (2) the cost of making corrections to the relevant NAV and accounting records of participant accounts not to exceed the amount set forth on the established fee schedule in effect at the time of the correction or, in the event no amount is set forth on the fee schedule, not to exceed $150 per hour.

   7.5    <u>**Statements and Reports**</u>.  The Master Trustee shall not less than monthly, and within ninety (90) days following the close of each fiscal year of the Plan or the effective date of the removal or resignation of the Master Trustee, file with the Named Fiduciary a written accounting setting forth all transactions since the end of the period covered by the last previous accounting.  The accounting shall include a listing of the assets of the Fund showing the value of

such assets at the close of the period covered by the accounting. On direction of the Named Fiduciary, and if previously agreed to by the Master Trustee in writing, the Master Trustee shall submit to the Named Fiduciary interim valuations, reports, or other information pertaining to the Fund. The Named Fiduciary may elect to receive certain information electronically through the Internet to an email address specified by it for such purpose. By electing to use the Internet for this purpose, the Named Fiduciary acknowledges that such transmissions are not encrypted and therefore are not secure. The Named Fiduciary further acknowledges that there are other risks inherent in communicating through the Internet such as the possibility of virus contamination and disruptions in service, and agrees that the Master Trustee shall not be responsible for any loss, damage or expense suffered or incurred by the Named Fiduciary or any person claiming by or through the Named Fiduciary as a result of the use of such methods.

7.6    **Participant Records.** The Master Trustee shall not be responsible nor liable to establish or maintain a record or account in the name of any individual participant or to establish the value of any participant's individual interest in the Fund or any account established hereunder.

7.7    **Review of Reports.** If, within ninety (90) days with respect to benefit payments and otherwise one hundred and eighty (180) days after the Master Trustee makes available to the Named Fiduciary a statement with respect to the Fund, the Named Fiduciary has not given the Master Trustee written notice of any exception or objection thereto, the statement shall be deemed to have been approved, and in such case, the Master Trustee shall not be liable for any claims concerning such statements.

7.8    **Inspection of Books and Records.** The Company or the Named Fiduciary shall have the right, at its own expense and with reasonable prior written notice to the Master Trustee, to inspect the Master Trustee's books and records directly relating to the Fund during normal business hours or to designate an accountant to make such inspection.

7.9    **Required Disclosure.** With respect to Securities that are registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act") or that are issued by an issuer registered under the Investment Company Act of 1940, as amended, Section 14(b) of the Exchange Act and Rule 14b-2 promulgated thereunder require the Master Trustee to disclose to issuers of such Securities, upon their request, the name, address and securities position of the Master Trustee's clients who are "beneficial owners" (as defined in the Exchange Act) of the issuer's Securities, unless the beneficial owner objects to such disclosure. The Exchange Act defines a "beneficial owner" as any person who has or shares the power to vote a security (pursuant to an agreement or otherwise) or who directs the voting of a security. The Company has designated on the signature page hereof, whether: (1) as beneficial owner, it objects to the disclosure of its name, address and securities position to any U.S. issuer that requests such information pursuant to the Exchange Act for the specific purpose of direct communications between such issuer and the Company; or (2) the Master Trustee shall contact the Named Fiduciary or (if the Named Fiduciary has appointed an Investment Manager) the Investment Manager with respect to relevant Securities to make the decision whether it objects to the disclosure of the beneficial owner's name, address and securities position to any U.S. issuer that requests such information pursuant to the Exchange Act.

With respect to Securities issued outside the United States, the Master Trustee shall disclose information required by any Depository, the laws or regulations of the relevant jurisdiction, rules of the relevant stock exchange or organizational documents of an issuer. The

Master Trustee is also authorized to supply any information regarding the Fund that is required by any law, regulation or rules now or hereafter in effect. The Named Fiduciary agrees to supply the Master Trustee with any required information if it is not otherwise reasonably available to the Master Trustee.

**7.10    Centralized Functions.**  The Bank of New York Mellon Corporation is a global financial organization that provides services to clients through its affiliates and subsidiaries in multiple jurisdictions (the "BNY Mellon Group").  The BNY Mellon Group may centralize functions, including audit, accounting, risk, legal, compliance, sales, administration, product communication, relationship management, storage, compilation and analysis of customer-related data, and other functions (the "Centralized Functions") in one or more affiliates, subsidiaries and third-party service providers.  Solely in connection with the Centralized Functions, (i) the Named Fiduciary consents to the disclosure of, and authorizes the Master Trustee to disclose, information regarding the Company and its accounts ("Customer-Related Data") to the BNY Mellon Group and to its third-party service providers who are subject to confidentiality obligations with respect to such information and (ii) the Master Trustee may store the names and business addresses of the Company's employees on the systems or in the records of the BNY Mellon Group or its service providers.  In addition, the BNY Mellon Group may aggregate Customer-Related Data with other data collected and/or calculated by the BNY Mellon Group, and the BNY Mellon Group will own all such aggregated data, provided that the BNY Mellon Group shall not distribute the aggregated data in a format that identifies Customer-Related Data with the Named Fiduciary.  The Company is authorized to consent to the foregoing and confirms that the disclosure to and storage by the BNY Mellon Group of such information is not intended to violate any relevant data protection legislation.  In addition, the Master Trustee may disclose Customer-Related Data as required by law or at the request of any governmental or regulatory authority.

**7.11    Sanctions.**

a.    It is the policy of the Company and its affiliated companies to be in compliance with all applicable Sanctions.  To support this policy, the Company maintains appropriate risk-based policies and procedures to address the requirements of all applicable Sanctions.

b.    The Named Fiduciary will promptly provide, or will cause the Named Fiduciary to promptly provide, to the Master Trustee such information as the Master Trustee reasonably requests in connection with the Sanctions, including information regarding the Fund, the Property held or to be held in the Fund, the source thereof, and the identity of any individual or entity having or claiming an interest therein.  The Master Trustee may decline to act or provide services in respect of any Fund, and take such other actions as it, in its reasonable discretion, deems necessary or advisable, in connection with the matters referenced in this Section 7.11.  If the Master Trustee declines to act or provide services as provided in the preceding sentence, except as otherwise prohibited by applicable law or official request, the Master Trustee will inform the Company and the Named Fiduciary as soon as reasonably practicable.

## SECTION 8 – PROVISIONS REGARDING MASTER TRUSTEE

**8.1    Standard of Care.**  The Master Trustee shall discharge its duties under this Agreement with the care and skill required under ERISA to the extent applicable to such duties

21

and shall otherwise exercise the standard of care of a professional custodian.  Exhibit B to this Agreement sets forth the Master Trustee's statement of fiduciary status as required by 29 C.F.R. 2550.408b-2(c)(1)(iv)(B).

        8.2    **Duties.**    The duties of the Master Trustee shall only be those specifically undertaken pursuant to this Agreement and shall be subject to such other limits on liability as are set out herein.

        8.3    **Limitation on Liability**.

        a.    The Master Trustee shall not be liable for Losses except to the extent that such Losses are a result of a breach of the Master Trustee's standard of care as described in Section 8.1 of the Agreement or the Master Trustee's negligence or willful misconduct.

        b.    None of the Master Trustee, the Company or the Named Fiduciary shall be liable to another party for indirect, consequential or special damages arising in connection with this Agreement, even if advised of the possibility of such damages.

        c.    The Master Trustee is not a party to, and has no duties or responsibilities under, the Plan other than those that may be expressly contained in this Agreement.  The Named Fiduciary acknowledges that the Plans do not impose any duties on the Master Trustee other than those contained in this Agreement;

        d.    The duties of the Master Trustee shall be limited to the assets held in the Fund, and the Master Trustee shall have no duties with respect to assets held by any other person including, without limitation, any other trustee for a Plan.  The Named Fiduciary hereby agrees that the Master Trustee shall not serve as, and shall not be deemed to be, a co-trustee under any circumstances, including, without limitation, any circumstances under which the Master Trustee continues to hold Property under Section 9.6 of this Agreement;

        e.    The Master Trustee shall not be responsible for the title, validity or genuineness of any Securities or evidence of title thereto received by it or delivered by it pursuant to this Agreement or for Securities held hereunder being freely transferable or deliverable without encumbrance in any relevant market;

        f.    The Master Trustee shall not be responsible for the failure to receive payment of, or the late payment of, income or other payments due to the Fund;

        g.    The Master Trustee shall have no duty to take any action to collect any amount payable on Securities in default or if payment is refused after due demand and presentment;

        h.    The Master Trustee may obtain the advice of prudently selected counsel and shall be fully protected with respect to anything done or omitted by it in good faith in conformity with such advice;

        i.    The Master Trustee shall have no duty or responsibility to inquire into, make recommendations, supervise, or determine the suitability of any transactions affecting the Fund and shall have no liability with respect to the Named Fiduciary's or an Authorized Person's decision to invest in Securities or to hold cash in any currency;

j.      The Master Trustee shall have no responsibility if the rules or procedures imposed by Depositories, exchange controls, asset freezes or other laws, rules, regulations or orders at any time prohibit or impose burdens or costs on the transfer of Securities or cash to, by or for the Fund; and

k.      The Master Trustee shall have no liability for any Losses arising from the insolvency of any Person, including but not limited to a Subcustodian, Depository, broker, bank, and a counterparty to the settlement of a transaction or to a foreign exchange transaction, except as provided in Sections 2.2 and 2.3 above.

**8.4      Force Majeure.**  Notwithstanding anything in this Agreement to the contrary, the Master Trustee shall not be responsible or liable for any failure to perform under this Agreement or for any Losses to the Fund resulting from any event beyond the reasonable control of the Master Trustee.

**8.5      Fees.**  The Master Trustee shall be paid the fees and charges as may be specifically agreed upon from time to time and such other fees and charges at the Master Trustee's standard rates for such services as may be applicable.  The Master Trustee shall be reimbursed for out-of-pocket expenses that are a normal incident of the services provided herein.  The Master Trustee is authorized to charge and collect from the Fund its fees and expenses unless such fees and expenses are paid directly by the Company.

**8.6      Indemnification.**  Except to the extent prohibited by applicable law, the Master Trust and/or the Company shall indemnify and hold harmless the Master Trustee from and against all Losses, including reasonable counsel fees and expenses in connection with third party claims and/or in connection with a successful defense of claims asserted by the Company, the Named Fiduciary and/or on behalf of the Trust, relating to or arising out of the performance of the Master Trustee's obligations under this Agreement, except to the extent resulting from a breach of the Master Trust's standard of care under this Agreement or the Master Trustee's negligence or willful misconduct.   This provision shall survive the termination of this Agreement.

## SECTION 9–AMENDMENT; REMOVAL OR RESIGNATION; ASSIGNMENT; PLAN TERMINATION

**9.1      Amendment.**  This Agreement may be amended only by written agreement among the Company, the Named Fiduciary and the Master Trustee.

**9.2      Removal or Resignation.**  The Master Trustee may be removed with respect to all or part of the Fund upon receipt of sixty (60) days' written notice (unless a shorter or longer period is agreed upon) from the Named Fiduciary.  The Master Trustee may resign as Master Trustee hereunder upon one-hundred and eighty (180) days' written notice (unless a shorter or longer period is agreed upon) delivered to the Named Fiduciary.  In the event of such removal or resignation, a successor trustee will be appointed and the Master Trustee shall transfer the Fund, less such amounts as may be reasonable and necessary to cover its compensation and expenses.  In the event the Named Fiduciary fails to appoint a successor trustee within one-hundred and eighty (180) days of receipt of written notice of resignation, the Master Trustee reserves the right to seek the appointment of a successor trustee from a court of competent jurisdiction.   The Master Trust shall terminate after a successor trustee has accepted its duties and the Master Trustee has transferred all assets then held by the Master Trustee to the successor trustee.  The

23

Master Trustee shall have no duties, responsibilities or liability with respect to the acts or omissions of any successor trustee.

**9.3    Successors and Assigns.**  This Agreement is not assignable by either the Master Trustee, Named Fiduciary or the Company without the prior written consent of the other parties to the Agreement, except that (i) the Master Trustee may assign this Agreement to any BNY Mellon Affiliate, provided that such BNY Mellon Affiliate shall have appropriate financial assets and sufficient expertise to carry out the obligations of the Master Trustee as contemplated by this Agreement, and (ii) any entity, that shall by merger, consolidation, purchase, or otherwise, succeed to substantially all the trust business of the Master Trustee shall, upon such succession and without any appointment or other action by the Company or the Named Fiduciary, be and become successor trustee hereunder.  The Master Trustee agrees to provide notice of such successor trustee to the Company and the Named Fiduciary.  Any assignment in violation of this provision shall be voidable at the option of the non-assigning party.  This Agreement shall be binding upon, and inure to the benefit of, the Company, the Named Fiduciary and the Master Trustee and their respective successors and permitted assigns.

**9.4    Assignment or Alienation.**  Except as may be provided by law, the Fund shall not be subject to any form of attachment, garnishment, sequestration or other actions of collection afforded creditors of the Company, participants or beneficiaries under the Plans. Except as may be required by law, the Master Trustee shall not recognize any assignment or alienation of benefits unless an Authorized Instruction is received from the Named Fiduciary.

**9.5    Plan Termination.**  Should the Master Trustee receive written notice from the Company or Named Fiduciary of the termination of one or more of the Plans, the Master Trustee shall distribute all assets of such Plan(s), less any fees and expenses payable from the Fund, pursuant to Authorized Instructions and upon receipt of appropriate documentation.  The Master Trustee shall be entitled to assume that such distributions are in full compliance with, and not in violation of, the terms of a Plan or any applicable law.

**9.6    Property Not Transferred.**  The Master Trustee reserves the right to retain such Property as is not suitable for distribution or transfer at the time of the termination of a Plan or this Agreement and shall hold such Property for the benefit of those persons or other entities entitled to such Property until such time as the Master Trustee is able to make distribution.  Upon the appointment and acceptance of a successor trustee with respect to the Property, the Master Trustee's sole duties shall be those of a custodian with respect to the Property not transferred.

## SECTION 10 – PARTICIPATION AND SEGREGATION

**10.1    Adoption of Master Trustby Subsidiaries and Affiliates.**  Any entity which is or becomes part of a controlled group with the Company as defined in Code Sections 414(b), (c) and (m) and which is now or may hereafter be organized under the laws of the United States of America, or of any State or Territory thereof, with the approval of the Company and by appropriate action of its own governing body, may adopt this Agreement, if such controlled group member shall have adopted one or more Plans qualified under Section 401(a) of the Code or tax-exempt under Section 1081.01(a) of the PR Code, and, pursuant to Section 1022(i)(l) of ERISA, under Section 501(a) of the Code.  Each entity adopting this Agreement represents to the Master Trustee that it is a part of such controlled group.  If any such controlled group member so adopts this Agreement, this Agreement shall establish the trust for such Plans as are specified by such controlled group member and shall constitute a continuation, amendment and restatement of

24

any prior trust for any such Plans.

**10.2   Segregation from Further Participation.**  The Company or Named Fiduciary may, if it so determines, at any time designate any group or groups of the eligible employees or other beneficiaries covered by a Plan as a separate class and may direct the Master Trustee to segregate in a separate fund, to be held for the benefit of such class, the part of the Fund allocable to such class as determined by the Company, Named Fiduciary or by an actuary appointed by the Company or Named Fiduciary, or some lesser amount than such allocable part if the Company, Named Fiduciary or such actuary shall determine that other equitable provision is made for the difference.  The Company or Named Fiduciary shall cause the Master Trustee to effect such segregation by notifying the Master Trustee of the Company's, Named Fiduciary's or such actuary's determination, together with evidence of appropriate action by the governing body directing such segregation.  The Master Trustee may rely conclusively and without investigation upon any such notification of the determination and evidence of appropriate action by the governing body and shall segregate such assets as the Company or Named Fiduciary may direct.  The Master Trustee's valuation of such assets for that purpose shall be conclusive.  The Master Trustee shall hold all of the assets so segregated under this provision, together with such payments as shall thereafter be made to the Fund on behalf of such class, and the income therefrom, as a subpart of the Fund and subject to the terms of this Agreement, or shall dispose of the same as directed by the Company or Named Fiduciary.  In the event that the Fund or any subpart thereof created by this Agreement shall be terminated as to such class, the Company or Named Fiduciary shall direct the disposition of the assets held by the Master Trustee for such class through transfer to a successor trustee, the purchase of annuities, or other means, as the Company or Named Fiduciary shall determine, and thereafter such employees and other beneficiaries shall not have any rights in the Fund, or against the Master Trustee.

**10.3   Loss of Qualification.**  The Named Fiduciary shall promptly notify the Master Trustee of any determination by the Internal Revenue Service that any Plan has ceased to be so qualified under Section 401(a) of the Code.  Upon such event or in the event that any Plan shall otherwise cease to become qualified, the equitable share of such Plan participating in the Fund shall be promptly segregated and withdrawn from the Fund.

## SECTION 11 – ADDITIONAL PROVISIONS

**11.1   Line Item Assets.**  The Master Trustee may reflect on its books and records certain bookkeeping entries for Master Trust Property including, but not limited to, mutual funds, book-entry securities and limited partnership interests that are selected and monitored by an Authorized Person.  The Master Trustee shall rely without independent verification on information provided by the Named Fiduciary or its designee regarding such Master Trust Property, including but not limited to positions and market valuations.

**11.2   Non-Fund Assets.**  At the request of the Company or the Named Fiduciary, the Master Trustee may provide consolidated recordkeeping services pursuant to which the Master Trustee reflects on statements securities and other assets not held by the Master Trustee ("Non-Fund Assets").  Non-Fund Assets shall be designated on the Master Trustee's books as "assets not held in custody" or by other similar characterization.  The Named Fiduciary acknowledges and agrees that it shall have no security entitlement against the Master Trustee with respect to Non-Fund Assets, that the Master Trustee shall rely, without independent verification, on information provided by the Named Fiduciary or its designee regarding Non-Fund Assets (including but not limited to positions and market valuations), and that the Master Trustee shall

have no responsibility whatsoever with respect to Non-Fund Assets or the accuracy of any information maintained on the Master Trustee's books or set forth on account statements concerning Non-Fund Assets.

**11.3    Appropriate Action.** The Master Trustee is hereby authorized and empowered to take any action with respect to the Fund that it deems necessary or appropriate to perform its obligations specifically set forth in this Agreement.

**11.4    Governing Law.** To the extent not preempted by federal law, this Agreement shall be construed in accordance with and governed by the substantive laws of the state of New York without regard to its conflict of laws provisions. The parties consent to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute hereunder. The Company and the Named Fiduciary each irrevocably waives any objection it may now or hereafter have to venue in such court and any claim that a proceeding brought in such court has been brought in an inconvenient forum. The parties hereby expressly waive, to the full extent permitted by applicable law, any right to trial by jury with respect to any judicial proceeding arising from or related to this Agreement.

**11.5    Sovereign Immunity.** To the extent that in any jurisdiction the Company or the Named Fiduciary may now or hereafter be entitled to claim, for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, the Company and the Named Fiduciary each irrevocably agrees not to claim, and each hereby waives, such immunity.

**11.6    Representations.** Each party represents and warrants to the other that it has full authority to enter into this Agreement upon the terms and conditions hereof and that the individual executing this Agreement on its behalf has the requisite authority to bind such party to this Agreement, and that the Agreement constitutes a binding obligation of such party enforceable in accordance with its terms.

**11.7    USA PATRIOT Act.** The Named Fiduciary hereby acknowledges that the Master Trustee is subject to federal laws, including the Customer Identification Program ("CIP") requirements under the USA PATRIOT Act and its implementing regulations, pursuant to which the Master Trustee must obtain, verify and record information that allows the Master Trustee to identify the Named Fiduciary and Company. Accordingly, prior to opening an account hereunder, the Master Trustee will ask the Named Fiduciary to provide certain information including, but not limited to, the Company's name, physical address, tax identification number and other information that will help the Master Trustee to identify and verify the Company's identity such as organizational documents, certificate of good standing, license to do business, or other pertinent identifying information. The Named Fiduciary agrees that the Master Trustee cannot open an account hereunder unless and until the Master Trustee verifies the Company's identity in accordance with the Master Trustee's CIP.

**11.8    Notices.** Notices shall be in writing and shall be addressed to the Master Trustee, the Company, or the Named Fiduciary at the address set forth on the signature page or such other address as any party may designate in writing to the others. All notices shall be effective upon receipt.

**11.9    Entire Agreement.** This Agreement and any related fee agreement constitute the entire agreement with respect to the matters dealt with herein, and supersede all previous

agreements, whether oral or written, and documents with respect to such matters, including but not limited to the Net Asset Value Calculation Procedures dated October 28, 2008.

11.10  **Necessary Parties.**  The Master Trustee reserves the right to seek a judicial or administrative determination as to its proper course of action under this Agreement.  Nothing contained herein will be construed or interpreted to deny the Master Trustee, the Named Fiduciary or the Company the right to have the Master Trustee's account judicially determined. To the extent permitted by law, only the Master Trustee, the Named Fiduciary and the Company shall be necessary parties in any application to the courts for an interpretation of this Agreement or for an accounting by the Master Trustee, and no participant under any of the Plans or other person having an interest in the Fund shall be entitled to any notice or service of process.  Any final judgment entered in such an action or proceeding shall, to the extent permitted by law, be conclusive upon all persons.

11.11  **No Third Party Beneficiaries.**  The provisions of this Agreement are intended to benefit only the parties hereto, their respective successors and assigns, and participants and their beneficiaries under the Plans.  There are no other third party beneficiaries.

11.12  **Execution in Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and said counterparts when taken together shall constitute but one and the same instrument and may be sufficiently evidenced by one set of counterparts.

[Signature page follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the latest date set forth below.

Authorized Signer of:
**COLGATE-PALMOLIVE COMPANY**

By: _____
Name: Elaine C. Paik
**Title:** Vice President and Corporate Treasurer
**Date:** September 25, 2017

Authorized Officer of:
**THE BANK OF NEW YORK MELLON**

By: _____
Name: CHARLES F. HOSKO
Title: VICE PRESIDENT
Date: 10/20/17

Address for Notice:
Colgate-Palmolive Company
300 Park Ave., 5th Floor
New York, NY 10022

Address for Notice:
The Bank of New York Mellon
c/o BNY Mellon Asset Servicing
_____

Attention: Juan Jimenez

Attention: _____

**COLGATE-PALMOLIVE PENSION FUND
COMMITTEE ("NAMED FIDUCIARY")**

By: _____
Name: Elaine C. Paik
**Title:** Vice President and Corporate Treasurer
**Date:** September 25, 2017

Address for Notice:
Colgate-Palmolive Company
300 Park Ave., 5th Floor
New York, NY 10022

Attention: Juan Jimenez

---

Pursuant to Section 7.9:

[ ] as beneficial owner, Company OBJECTS to disclosure

[ ] as beneficial owner, Company DOES NOT OBJECT to disclosure

[ ] Master Trustee shall CONTACT THE NAMED FIDUCIARY OR (if the Named Fiduciary has appointed an Investment Manager) THE INVESTMENT MANAGER with respect to relevant Securities to make the decision whether it objects to disclosure

IF NO BOX IS CHECKED, MASTER TRUSTEE SHALL RELEASE SUCH INFORMATION UNTIL IT RECEIVES A CONTRARY WRITTEN INSTRUCTION FROM THE COMPANY, NAMED FIDUCIARY OR INVESTMENT MANAGER, AS APPLICABLE.

---

## EXHIBIT A

## CROSS-TRADING INFORMATION

As part of the Cross-Trading Program covered by the Department of Labor Prohibited Transaction Exemption ("PTE") 95-56 granted to Mellon Bank, N.A. and its affiliates ("BNY Mellon"), BNY Mellon is to provide to each affected employee benefit plan the following information:

I.    The Existence of the Cross-Trading Program

BNY Mellon has developed and intends to utilize, wherever practicable, a Cross-Trading Program for Indexed Accounts and Large Accounts as those terms are defined in PTE 95-56.

II.   The "Triggering Events" Creating Cross-Trade Opportunities

In accordance with PTE 95-56, three "Triggering Events" may create opportunities for Cross-Trading transactions. They are generally the following (see PTE 95-56 for more information):

1.    A change in the composition or weighting of the index by the independent organization creating and maintaining the index;

2.    A change in the overall level of investment in an Indexed Account as a result of investments and withdrawals on the Indexed Account's opening date, where the Indexed Account is a bank collective fund, or on any relevant date for non-bank collective funds; provided, however, a change in an Indexed Account resulting from investments or withdrawals of assets of BNY Mellon's own plans (other than BNY Mellon's defined contributions plans under which participants may direct among various investment options, including Indexed Accounts) are excluded as a "Triggering Events"; or

3.    A recorded declaration by BNY Mellon that an accumulation of cash in an Indexed Account attributable to interest or dividends on, and/or tender offers for portfolio securities equal to not more than .5% of the Indexed Account's total value has occurred.

III.   The Pricing Mechanism Utilized for Securities Purchased or Sold

Securities will be valued at the current market value for the securities on the date of the crossing transaction.

Equity Securities - the current market value for the equity security will be the closing price on the day of trading as determined by an independent pricing service; unless the security was added to or deleted from an index after the close of trading, in which case the price will be the opening price for that security on the next business day after the announcement of the addition or deletion.

Debt Securities - the current market value of the debt security will be the price determined by BNY Mellon as of the close of the day of trading according to the Securities and Exchange Commission's Rule 17a-7(b)(4) under the Investment Company Act of 1940. Debt securities that are not reported securities or traded on an exchange, will be valued based on an average of the highest current independent bids and the lowest current independent offers on the day of cross trading. BNY Mellon will use reasonable inquiry to obtain such prices from at least three independent sources that are brokers or market makers. If there are fewer than three independent sources to price a certain debt security, the closing price quotations will be obtained from all available sources.

IV.   The Allocation Method

Direct cross-trade opportunities will be allocated among potential buyers or sellers of debt or equity securities on a pro-rata basis. With respect to equity securities, please note BNY Mellon imposes a trivial dollar amount constraint to reduce excessive custody ticket charges to participating accounts.

V.   Other Procedures Implemented by BNY Mellon for its Cross-Trading Practices

BNY Mellon has developed certain internal operational procedures for cross-trading debt and equity securities. These procedures are available upon request.

## EXHIBIT B

### FIDUCIARY STATUS

Statement Required by 408(b)(2)
Regarding Service Provider's Fiduciary Status

29 C.F.R. 2550.408b-2(c)(l)(iv)(B) requires a covered service provider, if applicable, to provide a statement that the service provider expects to provide services as a fiduciary within the meaning of section 3(21) of ERISA. As trustee, The Bank of New York Mellon reasonably expects that some of the services which it will provide under the Agreement will be as a fiduciary as defined in section 3(21) of ERISA and some will be non-fiduciary in nature. In its role as a directed trustee, the Master Trustee does not have discretionary investment management authority, render investment advice for a fee or have discretionary authority or responsibility in the administration of the covered plan(s). Nonetheless, as a directed trustee, the Master Trustee retains certain limited fiduciary responsibilities, such as determining that directions of a named fiduciary are proper, following processes designed to avoid prohibited transactions, and not knowingly participating in a breach of fiduciary responsibility of another fiduciary. All of The Bank of New York Mellon's custodial duties and responsibilities, including but not limited to safekeeping of assets, processing of corporate actions, trade settlement, posting of income and other receipts, reporting of transactions, and reporting of prices are expected to be performed in a non-fiduciary capacity. Ultimately, whether The Bank of New York Mellon is acting as a fiduciary is dependent upon the terms of the Agreement and the facts surrounding a particular function. With respect to foreign exchange transactions done through The Bank of New York Mellon's Global Markets FX Desk, it is acting as a principal counterparty on its own behalf and is not acting as a fiduciary or agent for the Company, a Named Fiduciary, an Investment Manager or the Master Trust.