UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

PAULA DISBERRY,

                              Plaintiff,

        -against-

EMPLOYEE RELATIONS COMMITTEE OF
THE COLGATE-PALMOLIVE COMPANY,
ALIGHT SOLUTIONS LLC, AND BANK OF
NEW YORK MELLON CORPORATION,

                              Defendants.

------------------------------------------------------------x

No. 22 Civ. 5778 (CM)

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: 12/19/22

**DECISION AND ORDER DENYING THE MOTION TO DISMISS OF DEFENDANT
ALIGHT SOLUTIONS LLC, AND GRANTING THE MOTION TO DISMISS BY
DEFENDANT BNY MELLON AND DENYING THE MOTION TO DISMISS BY THE
EMPLOYEE RELATIONS COMMITTEE OF THE COLGATE-PALMOLIVE
COMPANY**

McMahon, J.:

        Plaintiff Paula Disberry ("Plaintiff") was the victim of the heinous crime of identity theft.

A "fraudster," as the complaint identifies the malefactor, was able to convince the third-party

service provider for Colgate-Palmolive's savings and investment plan, first to change her PIN,

then to change her address and other identifying information, and finally to direct Bank of New

York Mellon to empty her company-sponsored savings and investment account, sending the

proceeds to the still-unknown thief. Despite filing criminal complaints in the United States and

South Africa, as well as complaining to the various defendants in this lawsuit, Ms. Disberry has

been unable to get her hard-earned money back.

        So Plaintiff brings this action against Employee Relations Committee of the Colgate-

Palmolive Company, Alight Solutions, LLC, and Bank of New York Mellon (collectively, the

"Defendants") alleging that Defendants breached their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq.

The three Defendants have moved separately for dismissal of Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The motions made by Defendants Alight and the Committee are denied; BNY Mellon's motion is granted.

## BACKGROUND

### I.     The Parties

Plaintiff Paula Disberry worked for Colgate-Palmolive from December 1993 to March 2004 in England, Mexico, and the United States. (Dkt. No. 1 ¶ 8 ("Compl.")). In 1998, Plaintiff became eligible to participate in the Colgate-Palmolive Company Employees Savings and Investment Plan (the "Plan"). (*Id.* ¶ 9). Plaintiff left Colgate-Palmolive in March 2004. (*Id.*) She has lived in South Africa since 2008. (*Id.* ¶ 10).

Defendant Employee Relations Committee of the Colgate-Palmolive Company (the "Committee) is the Plan Administrator of the Plan within the meaning of ERISA. (*Id.* ¶ 4). At all relevant times, the Committee was the named fiduciary of the Plan by reason of being the Plan Administrator. (*Id.*)

Defendant Alight Solutions, LLC ("Alight") provided contract administration, record-keeping, and information management services to the Plan, for which it was compensated for its services by direct payment from the Plan. (*Id.* ¶ 5). Plaintiff alleges that Alight operated a telephone customer service center, referred to as the "Benefits Information Center" or the "Customer Care Center," and a website at www.colgatebenefits.com, both of which provide Plan participants with the ability to manage their Plan accounts, including requesting distributions of benefits. (*Id.*) Plaintiff alleges that Alight exercised control over Plan assets by facilitating,

directing and processing distributions from participants' accounts, including the unauthorized distributions in this case. (*Id.*)

Defendant Bank of New York Mellon ("BNY Mellon") served as a Plan Trustee, provided investment management services to the Plan, served as custodian of Plan's assets, and made Plan payments from the Plan's trust fund, for which it was compensated for its services by investment management fees paid directly from the Plan. (*Id.* ¶ 6). Plaintiff alleges that, per the Master Trust Agreement, BNY Mellon agreed to implement and maintain a comprehensive information security program designed to protect the Plan's sensitive information, as well as to protect against threats or hazards and unauthorized access to or use of such information that could result in harm to Plan participants and that it agreed to discharge its duties with the care and skill required under ERISA and to otherwise exercise the standard of care of a professional custodian. (*Id.*)

## II.    Factual Background

Throughout her time at Colgate-Palmolive, Plaintiff made regular contributions to the Plan. As of March 17, 2020, her account balance under the Plan was just over $750,000. (Compl. ¶ 9) This sum represented a significant portion of Plaintiff's retirement savings. (*Id.* ¶¶ 9, 11).

At that time, Plaintiff was 52 years of age. (*Id.* ¶ 11). Plaintiff alleges that it is, and always has been, her intention to leave her Plan account alone until she was ready to retire at approximately age 65. (*Id.*)

When Plaintiff moved to South Africa in 2008, she updated her contact information with the Plan – which consists of (1) a physical mailing address, (2) an email address, and (3) a cell phone number. She updated her contact information again in 2016. (*Id.* ¶ 10). Plaintiff's actual contact information has not changed since that 2016 update. (*Id.*)

## A.    The Fraud

On January 29, 2020, an unknown individual (the "fraudster") contacted the Plan's Benefits Information Center – the telephone customer service center operated by Alight – pretending to be Plaintiff. (Compl. ¶¶ 5, 14). She asked Alight to update her Plan contact information. (*Id.* ¶ 14). Alight sent a temporary personal identification number ("PIN") by what we now call "snail mail" to Plaintiff's South Africa address. (*Id.*) Plaintiff did not receive this letter; she alleges that the fraudster – and/or others working with her – intercepted her mail and stole the temporary PIN. (*Id.*)

On February 24, 2020, the fraudster again contacted the Benefits Information Center, where she used the temporary PIN to create a new permanent PIN for Plaintiff's account. (*Id.* ¶ 15). She also caused Alight to change the phone number and email addresses associated with the account to a new number and email address, neither of which belonged to Plaintiff. (*Id.*)

Having taken these steps, on March 9, 2020, the fraudster accessed Plaintiff's Plan account online using the Colgate-Palmolive Benefits website, which is also operated by Alight. When she did so, she added information for direct deposit at a Bank of America branch with a Las Vegas address. (*Id.* ¶ 17).

A week later, on March 17, 2020, the fraudster again accessed Plaintiff's account online and attempted to distribute the entire contents of Plaintiff's account via direct deposit, to the Bank of America account in Las Vegas. (*Id.* ¶ 18). She also changed Plaintiff's mailing address from the address in South Africa to an address in Las Vegas. (*Id.*)

The same day, the fraudster called Alight's Benefits Information Center and said she had requested a total distribution from the Plan via direct deposit. (*Id.* ¶ 19). The representative informed her that the Plan did not make distributions by direct deposit. (*Id.*) The fraudster then told the benefits representative that she wanted the distribution made by check, to be sent to the

4

Las Vegas mailing address. (*Id.*) During the course of that phone call, the benefits representative arranged for the transaction. (*Id.*) A confirmation of payment notice was sent by mail to the Las Vegas address. (*Id.* ¶ 21).

On March 20, 2020, BNY Mellon mailed a check for $601,144.42 ( $751,430.53, the gross amount of the distribution, less mandatory tax withholdings)[1] to the Las Vegas mailing address. (*Id.* ¶ 20). Whoever received the check cashed or deposited it at a bank in Las Vegas on March 27, 2020. (*Id.*)

**B.      Plaintiff's Attempts to Recover the Funds**

Plaintiff discovered that her money was missing on September 14, 2020. (Compl. ¶ 13). Immediately upon discovering the fraud, Plaintiff alerted Alight to the theft of her Plan assets. (*Id.* ¶ 23). In response, Alight placed a freeze on Plaintiff's account -- a bit late, as there were no longer any funds in the account -- and conducted a fraud investigation. (*Id.* ¶¶ 22-23).

Based on its review, Alight concluded that Plaintiff appeared to have been the victim of identity theft. (*Id.*) Per the investigation report, during the first half of 2020, the fraudster had made seven additional phone calls to the Benefits Information Center and at least eleven additional attempts to log into the website in order to access Plaintiff's account information. On those occasions, the person trying to hack into Plaintiff's account was unable to provide the PIN, address, phone number or email address that were on file for the account and so was unable to access the account. (*Id.* ¶ 22).

Plaintiff also reported the fraud to multiple authorities. She has participated in investigations by the South African Police Service and the U.S. Secret Service office in Pretoria,

---

[1]       According to a February 23, 2022 Claim Summary prepared by Colgate-Palmolive, the $150,286.33 of income tax that was withheld from the unauthorized distribution was subsequently unwound by Alight and redeposited with the Plan pending resolution of Plaintiff's claim.

South Africa. (*Id.* ¶ 25). She also placed a fraud alert on her credit file with Equifax, and she

appointed the private firm of ENSafrica Forensics to conduct an investigation into the fraud. (*Id.*)

Between September 2020 and October 2021, Plaintiff was also in contact with Colgate-

Palmolive representatives[2] to update them on her efforts with the criminal investigations.

(*Id.* ¶ 33). Despite her efforts, she has not gotten her money back. (*Id.*)

On October 6, 2021, Plaintiff submitted a claim for benefits under the Plan to the Plan's

Claims Administrator, to whom the Committee has delegated discretionary authority (1) to make

decisions regarding the interpretation and application of plan provisions, (2) to make

determinations as to rights and benefits of employees and participants under the Plan, and (3) to

make claims determinations under the Plan.[3] (*Id.* ¶ 34; Dkt. No. 39 at 3; Dkt. No. 40-3 at 80). In

submitting her claim, Plaintiff asked the Claims Administrator to either confirm that the fraud

had not impaired or reduced her benefits under the Plan, or to restore to her Plan account the

amount of the fraudulently obtained distribution. (Compl. ¶ 34). On April 7, 2022, the Plan's

Claims Administrator denied her claim. (*Id.*; Dkt. No 40-1).

### III.   The Present Litigation

On July 7, 2022, Plaintiff filed the Complaint in this action alleging one count against all

Defendants for breach of fiduciary duty under ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109

and 1132(a)(2).

Plaintiff asserts that all Defendants are fiduciaries under the Plan and all of them

breached their fiduciary duties of loyalty and prudence by (1) causing or allowing the Plan to

make unauthorized distributions of Plan assets; (2) failing to identify and investigate suspicious

---

[2]      The Complaint does not specify whether Plaintiff contacted representatives of Colgate-Palmolive the company or representatives of the Plan.

[3]      The Summary Plan Description notes that the Claims Administrator is the Human Resources Department of Colgate-Palmolive Company. (Dkt. No. 40-3 at 85). The Claims Administrator is not a party to this action.

activities and red flags; (3) failing to identify and halt suspicious distribution requests; (4) failing to confirm authorization for distributions with Plaintiff before making distributions; (5) failing to provide timely notice of a request for distributions to Plaintiff by telephone or email; (6) failing to establish distribution processes to safeguard Plan assets against unauthorized withdrawals; and (7) failing to monitor other fiduciaries' distribution processes, protocols, and activities. (*Id.* ¶ 43).

Plaintiff alleges that numerous red flags should have caused Defendants to become suspicious that fraudulent activity was taking place: (1) within the span of less than two months the fraudster changed Plaintiff's phone number, email address, mailing address, and bank account information, and then requested an immediate cash distribution of Plaintiff's entire $750,000 Plan account; (2) the fraudster changed Plaintiff's contact information such that her phone number and email address were in one country while her mailing address was in a different country; (3) although Plaintiff was not yet 59 ½ years old, the fraudster asked for an immediate cash distribution instead of a tax protected roll-over distribution, resulting in an additional 10% tax penalty; (4) the fraudster failed to contact the International Benefits Department prior to requesting a distribution while residing in a foreign country, although the Plan's Summary Plan Description ("SPD") strongly recommended that this be done; and (5) there were numerous attempts to access Plaintiff's Plan account via telephone and online within a short time span, many of which were unsuccessful. (*Id.* ¶ 35). Plaintiff asserts that Defendants failed to notice or act on any of these suspicious occurrences, leading to the loss of Plaintiff's Plan assets. (*Id.*)

Plaintiff further alleges that the South African postal service has been in turmoil for some years and is known for its lack of security, delays, corruption, and mismanagement – making it unreasonable and imprudent for Defendants to provide a temporary PIN via snail mail to a South

African address without also notifying the participant of the PIN request via telephone or email. She also alleges that the phone or email should have been used to notify her that a request for disbursement of account funds had been made. (*Id.*)[4]

Finally, Plaintiff claims that Defendants failed to follow their own procedures by not waiting 14 days after Plaintiff's address was changed before processing the request for distribution of Plan assets. (*Id.* ¶ 37).

Plaintiff demands recovery of her improperly distributed funds, together with an amount equal to what those funds would have earned in investment income from the distribution date to the date of judgment, as well as attorneys' fees and costs. (*Id.* Claim For Relief.)

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

---

[4]    I am constrained to note that, on the allegations of the Complaint, Plaintiff's phone number and email address were changed by the fraudster before any request was made to disburse the funds in her account. (*See* Compl. ¶ 14).

## DISCUSSION

All three Defendants argue that the Complaint must be dismissed for failure to state a claim under 12(b)(6). Under ERISA, "To state a claim for breach of a fiduciary duty, a plaintiff must allege that (1) the defendant was acting as a fiduciary of the plan, (2) the defendant breached that duty, and (3) the breach caused harm to the plaintiff." *Laboy v. Bd. of Trustees of Bldg. Serv. 32 BJ SRSP*, 513 F. App'x 78, 79 (2d Cir. 2013).

BNY Mellon and Alight each move to dismiss based on this first factor. They argue that the Complaint did not plead facts sufficient to establish that either BNY Mellon or Alight acted as a fiduciary of the Plan. Although it is well settled in this district that ERISA preemption extends only to Plan fiduciaries, and that common law claims that would be preempted were they asserted against a Plan fiduciary may in fact be asserted against non-fiduciaries (such as persons who perform merely ministerial tasks with respect to an ERISA Plan, *see, e.g., Forgione v. Gaglio*, No. 13 CIV. 9061 KPF, 2015 WL 718270, at *19 (S.D.N.Y. Feb. 13, 2015); *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 472 (S.D.N.Y. 2014)), Plaintiff has not asserted any common law claims against either BNY Mellon or Alight. As to them, the viability of her Complaint thus depends on whether her allegation that they were Plan fiduciaries is correct.

The Committee, as the named fiduciary under the Plan, does not dispute that the first factor is met. Instead, it argues that Plaintiff did not plead facts showing that the Committee breached any fiduciary duty to Plaintiff, or that any act of the Committee caused the harm to Plaintiff.

## I.    Documents To Be Considered

In determining a motion to dismiss, apart from the complaint itself, the court may consider any documents attached to it as exhibits or incorporated into the complaint by reference.

*See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Even if a document is not incorporated by reference, the court may still consider it while adjudicating a motion to dismiss, as long as the complaint "relies heavily upon [the document's] terms and effect." *Id.* at 153; *Vollinger v. Merrill Lynch & Co.*, 198 F.Supp.2d 433, 438 (S.D.N.Y. 2002). However, a court must exclude all other extrinsic documents from its review, or, alternatively, convert the motion to one for summary judgment, allowing the parties to conduct discovery in accordance with Rule 56. *See* Fed. R. Civ. Pro. 12(d); *Chambers*, 282 F.3d at 154.

Defendant BNY Mellon in its motion to dismiss asks the court to consider the Plan's Master Trust Agreement. (Dkt. No. 44 at 6; Dkt. No. 43-1). The Committee in its motion to dismiss asks the court to consider the SPD in effect in March, 2020 (at the time of the alleged breach of Plaintiff's Plan account by the fraudster). (Dkt. No. 39 at 2; Dkt. No. 40-3). As both of these documents are incorporated by reference into the Complaint, this court may consider them. (Compl. ¶¶ 6, 31).

Alight, for its part, asks the court to consider the Master Services Agreement ("MSA") between Alight and Colgate-Palmolive, pursuant to which Alight agreed to provide certain services to the Plan.[5] (Dkt. No. 52 at 2). Unlike the Master Trust Agreement and the SPD, the MSA is neither attached to nor incorporated by reference into the Complaint. However, the MSA is central to Plaintiff's claim that Alight became a fiduciary to the Plan due to the duties it was obligated to perform through its contractual relationship with Colgate-Palmolive. Moreover, the Complaint describes the specific services that Alight was contracted to perform for the Plan and the compensation that Alight received for such services. (*See* Compl. ¶ 5). Finally, the SPD

---

[5]    Alight also asks the court to consider Alight's Report of Investigation, which is a report on the investigation of the fraud on Plaintiff's account that Alight conducted in September 2020, after Plaintiff alerted it to the theft of Plan assets. (Dkt. No. 52 at 2 n.2). While the Complaint incorporates this report by reference (Compl. ¶ 22), the court does not need to consider it in deciding on Alight's motion to dismiss.

discusses how "The Plan Administrator has engaged Alight Solutions as an external recordkeeper for the S&I Plan accounts." (SPD, Dkt. No. 40-3 at 85). The court will, therefore, consider the contents of this document as integral to the allegations of the Complaint.

## II.   Alight's Motion To Dismiss Is Denied

Alight argues in its motion to dismiss that Plaintiff's claims against it must be dismissed because Alight was not acting as a fiduciary when taking the actions that form the basis of Plaintiff's claim. (Dkt. No. 52 at 6-7).

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was *acting as a fiduciary* (that is, was performing a fiduciary function) when taking the action subject to complaint." *Massaro v. Palladino*, 19 F.4th 197, 211 (2d Cir. 2021) (citing *Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)) (emphasis in original). "Congress intended ERISA's definition of fiduciary to be broadly construed." *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997) (internal quotations and citations omitted).

ERISA provides that every employee benefit plan must provide for one or more named fiduciaries who possess the "authority to control and manage the operation and administration of the Plan." 29 U.S.C. § 1102(a)(1). The entity or individual identified as the "administrator" in the plan document is automatically deemed a named fiduciary. 29 U.S.C. § 1002(16)(A). In this case, that named fiduciary is the Committee, not Alight.

However, a person may also be deemed an ERISA fiduciary if it meets the definition of a "functional fiduciary," which is as follows:

a person is a fiduciary with respect to a plan *to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets*, (ii) he renders

investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. (Emphasis added)

29 U.S.C. § 1002(21).

The Second Circuit has explained that, "Under this definition, a person may be an ERISA fiduciary with respect to certain matters but not others; fiduciary status exists only to the extent that the person has or exercises the described authority or responsibility over a plan." *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 366 (2d Cir. 2014) (internal quotations omitted).

Plaintiff alleges, in an entirely conclusory fashion, that Alight exercised authority or control over the management or disposition of the Plan's assets, exercised discretionary authority or discretionary control respecting management of the Plan, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. (Compl. ¶ 5).

Alight argues that it is not a Plan fiduciary. It asserts that the Complaint identifies it as performing purely ministerial tasks when it alleges that, "Alight exercised control over Plan assets by facilitating, directing and processing distributions from participants accounts" (*id.*), or that "[Alight] operated a telephone customer service center . . . and a website . . . which provided Plan participants . . . the ability to manage their Plan accounts, including distribution of benefits." (*Id.*) Alight cites to Department of Labor regulations, which provide that "a person who performs purely ministerial functions," such as "application of rules determining eligibility for participation or benefits . . . preparation of employee communications material . . . maintenance of participants' service and employment records . . . [and] calculation of benefits . . . is not a fiduciary." 29 C.F.R. § 2509.75-8.

To support its position, Alight points to the MSA, which gave Alight none of the discretionary authority that is the hallmark of a functional fiduciary, but instead placed strict limits of Alight's authority regarding the Plan's assets:

> "[Alight] does not have any discretionary control respecting management of any Colgate Plan or management or disposition of any Colgate Plan assets. [Alight] does not have any discretionary authority or discretionary responsibility in the administration of the Colgate Plans and [Alight] should act at all times as a ministerial administrative service provider."

Dkt. No. 54-1 at § 16(D); Dkt. No. 52 at 2.

As Alight observes, the Second Circuit has recognized that an entity is not a fiduciary when the agreement outlining its responsibilities "specifically withholds . . . the sort of discretionary responsibilities that create fiduciary status" under ERISA. *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, at *5 (2d Cir. 2017).

However, immediately following this language in the MSA that Alight cites to in its briefing, the MSA goes on to state as follows:

> "Notwithstanding the foregoing, [Alight] acknowledges that [] *if it exercises discretion with respect to the administration of the Colgate Plans or the assets of the Colgate Plans, it may be a fiduciary under ERISA. . . ERISA may impose fiduciary liabilities* under certain circumstances on persons who act in good faith but *nevertheless act in ways that trigger such fiduciary responsibilities*, and therefore nothing herein shall in any way constitute a waiver or limitation of any rights which Colgate or the Colgate Plans may have under any such Laws if Provider acts as a fiduciary in the performance of the Services."

Dkt. No. 54-1 at § 16(D); Dkt. No. 52 at 2.

As such, the MSA acknowledges that "The issue is not just how the duties are characterized, but what they are." *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997). Therefore, "putting the magic words in the contract, 'purely ministerial duties,' does not avoid fiduciary responsibility, if the characterization, 'purely ministerial duties,' is not

correct." *Id.* So the MSA's language restricting discretionary activities does not automatically preclude a finding that Alight acted as a fiduciary if it did in fact exercise discretion.

Plaintiff argues that this focus on Alight's lack of discretion is irrelevant because, when the disposition of plan assets is involved, any degree of "authority or control" – not just "discretionary" authority or control – is sufficient to confer functional fiduciary status. (Dkt. No. 61 at 18). Given ERISA's broad remedial purpose, courts have held that "'Any' control over disposition of plan money makes the person who has the control a fiduciary." *IT Corp.*, 107 F.3d at 1421. "[ERISA] differentiates between those who manage the plan in general, and those who manage the plan assets. . . . A significant difference between the two clauses is that discretion is specified as a prerequisite to fiduciary status for a person managing an ERISA plan, but the word 'discretionary' is conspicuously absent when the text refers to assets." *Bd. of Trustees of Bricklayers & Allied Craftsmen Loc. 6 of New Jersey Welfare Fund v. Wettlin Assocs., Inc.*, 237 F.3d 270, 272–73 (3d Cir. 2001). The Second Circuit likewise has stated that, "By focusing on whether the [defendants] were administrators of the Funds . . . the district court overlooked the fact that an individual also may be an ERISA fiduciary by . . . 'exercis[ing] *any* authority *or* control respecting management *or* disposition of [plan] assets.'" *LoPresti*, 126 F.3d at 40 (quoting 29 U.S.C. § 1002(21)(A)(i) and (iii)) (emphasis in original).

Plaintiff argues that both Alight's actions as alleged in the Complaint and the MSA itself demonstrate that Alight had at least some degree of control respecting the disposition of Plan assets. (Dkt. No. 61 at 18).[6]

First, the Complaint alleges that Alight (and Alight alone) had custody of individual Plan participants' account information, including identifying information that authorized access to

---

[6]    I reject out of hand Plaintiff's argument that any factual allegation in the Complaint suggests that Alight had any control whatever over the "management" of the Plan's assets.

14

those accounts; that Alight dictated and controlled the process by which a Plan participant could make changes to that information or could request distributions; and that – at least in the case at bar -- an Alight representative personally processed the fraudulent request for distribution of the money in Plaintiff's account.

Second, Plaintiff points to provisions of the MSA that it alleges do give Alight authority or control regarding the disposition of assets. Specifically, Plaintiff highlights that Alight's duties under the MSA include the following: "Instruct disbursement agent daily for loans, withdrawals, dividend payouts, installments and final distribution payments," (Dkt No. 54-2 at 11); "Process all distributions in accordance with plan rules," (*id.* at 27); "Process paperless distributions," (*id.*); and "Process lump sum distributions." (*Id.*). And indeed, BNY Mellon argues in its motion to dismiss that it did nothing more than follow the instructions from Alight to cut a check and send it to (ostensibly) Plaintiff at a Las Vegas address. (Dkt. No. 44 at 2-3).

Certainly at least some of the allegations in the Complaint relate to activity that qualifies as "purely ministerial" (including operating a call center and a website through which participants can themselves control the distribution of assets). And allegations relating to Alight's maintenance of account information, and even its control over making changes to account information, are similarly ministerial in nature and do not, fairly read, suggest that Alight had any control over the disposition of Plan assets.

However, reading the Complaint in the light most favorable to the Plaintiff, it is not possible to dismiss out of hand the possibility that Alight would qualify as a "functional fiduciary" within the meaning of ERISA, given its alleged role in directing the institution that held the Plan assets (BNY Mellon) to make the distribution in Plaintiff's case.[7]

---

[7]      I emphasize that it is simply an allegation that Alight processed the fraudulent distribution; it may turn out that this is not so.

Alight also argues that there is not a sufficient link between the allegedly fiduciary actions that Alight took and the misconduct in which Alight is alleged to have engaged in. (Dkt. No. 52 at 7).

A plaintiff "must also allege a 'nexus' between defendants' discretion and 'the wrongdoing alleged in the Complaint.'" *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, No. 17-CV-855 (JPO), 2018 WL 1585673, at *6 (S.D.N.Y. Mar. 28, 2018) (quoting *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co. (U.S.A)*, 768 F.3d 284, 297 (3d Cir. 2014)). "The guiding question is whether [the defendant] was acting as a fiduciary 'when taking the action subject to complaint,' whether or not [the defendant] exercised discretion with respect to other aspects of Plan administration is immaterial." *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 681 (S.D.N.Y. 2018), *aff'd sub nom. Doe 1 v. Express Scripts, Inc.*, 837 F. App'x 44 (2d Cir. 2020) (quoting *Pegram*, 530 U.S. at 226).

The Complaint includes a number of allegations of how "Defendants" breached their fiduciary duties under ERISA, without specifying which particular Defendant engaged in the action giving rise to the alleged breach. For example, the Complaint asserts that "Defendants failed to heed or even notice [] suspicious actions" (Compl. ¶ 35); that "Defendants failed to follow their own procedures," (*id.* ¶ 37); that "Defendants . . . failed to implement reasonable procedures to detect and prevent fraud and theft of Plan assets; (*id.* ¶ 38); and that "the Plan did not have reasonable procedures in place." (*Id.* ¶ 35). Alight argues that these vague allegations, without more specificity as to which Defendant engaged in what conduct, fail to meet the plausibility standard. (Dkt. No. 52 at 10).

This amalgamation of "defendants" into a single entity is frequently fatal to complaints. However, the Complaint does allege facts that are sufficient to tie the fiduciary acts of Alight to

the wrongdoing alleged in the Complaint. Specifically, the Complaint alleges that the Defendants – including specifically Alight – ignored "significant red flags," during the course of Alight's repeated interactions with the fraudster. While Plaintiff amalgamates the "Defendants," it is clear that Alight was the party that was having these interactions with the fraudster and that Alight at the very least is a party that should have been alerted to the possibility that someone was trying to hack into Plaintiff's account. These include the fact that, within the span of less than two months, the fraudster changed Plaintiff's phone number, email address, mailing address, and bank account information, and then requested an immediate cash distribution of Plaintiff's entire $750,000 Plan account; that the fraudster changed Plaintiff's contact information such that the phone number and email address were from one country and the mailing address was in a different country; that the fraudster requested an immediate cash distribution instead of a tax protected roll-over distribution and that they were doing so prior to age 59 ½, subjecting them to an additional 10% tax penalty, among others. (Compl. ¶ 35). All of these red flags relate to the fraudster's repeated communications with Alight's call center and use of the website managed by Alight. As such, these allegations certainly apply to Alight and so are sufficient to establish the required "nexus" between Alight's authority and control and the wrongdoing alleged in the Complaint. Additionally, Alight is specifically alleged to have violated its own protocols by not waiting two weeks after making an address change before processing a distribution request. (*Id.* ¶ 37). That allegation applies specifically and solely to Alight.

For these reasons, Alight's motion to dismiss the claim asserted against it in the Complaint is DENIED.

That said, the fact that the court cannot grant the motion to dismiss does not mean that Alight will ultimately be found to be a functional fiduciary within the meaning of ERISA. It is

somewhat surprising that Plaintiff has not alleged an alternative claim against Alight under common law principles of negligence. "ERISA bars only state law claims against fiduciaries; state law claims against non-fiduciaries escape preemption." *United Teamster Fund*, 39 F. Supp. 3d at 472 (citing *Burger v. Empire Blue Cross & Blue Shield*, No. 99 Civ. 4366 (LMM), 2000 WL 1425101, at *2 (S.D.N.Y. Sept. 27, 2000)). "Where the evidence has not yet shown whether defendants are fiduciaries, plaintiffs may plead state law claims in the alternative." *United Teamster Fund*, 39 F. Supp. 3d at 473 (internal quotation marks omitted) (quoting *Pedre Co. v. Robins*, 901 F. Supp. 660, 666 (S.D.N.Y. 1995)); *see also In re Allianz Glob. Invs. U.S. LLC Alpha Series Litig.*, No. 20 CIV. 10028 (KPF), 2021 WL 4481215, at *11 (S.D.N.Y. Sept. 30, 2021). The facts pleaded, if proved, would almost certainly suffice to make out a negligence claim against Alight if it turned out not to be a functional fiduciary under ERISA. I make note of this only because the statute of limitations on an "in the alternative" common law claim will run sometime in March 2023; the clock is ticking.

## III.   BNY Mellon's Motion to Dismiss Is Granted

BNY Mellon also argues in its motion to dismiss that Plaintiff's claims against it must be dismissed because it was not acting as a fiduciary when taking the action alleged in Plaintiff's Complaint. (Dkt. No. 44 at 7). Its argument succeeds where Alight's failed.

The Complaint alleges that BNY Mellon "served as a Plan Trustee, provided investment management services to the Plan, served as custodian of the Plan's assets, and made Plan payments from the Plan's trust fund." (Compl. ¶ 6). Plaintiff also cites to the Plan's Master Trust Agreement, to allege that "BNY Mellon agreed to implement and maintain a comprehensive information security program" and that it "agreed to discharge its duties with the care and skill required under ERISA and to otherwise exercise the standard of care of a professional custodian." (*Id.*) This, Plaintiff alleges, made BNY Mellon a fiduciary of the Plan. (*Id.*)

However, the Master Trust Agreement explicitly states that, "In its role as a directed trustee, [BNY Mellon] does not have discretionary investment management authority, render investment advice for a fee or have discretionary authority or responsibility in the administration of the covered plan(s)."[8] (Dkt. No. 43-1, at B-1). Moreover, the Second Circuit has held that a directed trustee like BNY Mellon "does not exercise or possess discretionary authority when it makes   or   changes   investments   pursuant   to   [another   party's]   instructions . . . Nor does . . . managerial ownership of them create the independent discretion that is the touchstone of an ERISA fiduciary analysis." *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 718 F. App'x 3, 6 (2d Cir. 2017). This is exactly what BNY did.

The only action that BNY Mellon took in connection with the fraud was to issue a check for the amount in Plaintiff's account. Plaintiff has not alleged any facts to show that BNY Mellon had "authority" or "control" with respect to that action. Under the Master Trust Agreement, BNY Mellon is responsible for "provid[ing] benefit payment disbursement services for the Company's Plans," including creating and furnishing "checks, direct deposits, or wire transfers for participant benefit distributions *as instructed by the Plans' recordkeeper(s).*" (Dkt. No. 43-1, at §§ 1.7, 2.8) (emphasis added).

As Plaintiff points out, the MSA stated that Alight must "Instruct disbursement agent daily for . . . final distribution payments." The Complaint supports this; it specifically alleges that it was an Alight Benefits Information Center representative that spoke with the fraudster and "conducted the distribution transaction online." (Compl. ¶ 19). There is no allegation that BNY had any

---

[8]      ERISA § 403 requires that one or more trustees must hold the assets of the plan in trust. 29 U.S.C. § 1103(a). The authority of the trustee with regard to the management of the plan's assets can be structured in different ways. A discretionary trustee may have full discretion to manage the plan's assets, or a directed trustee may instead have only the authority to manage the plan's assets according to the directions of a named plan fiduciary or a section 3(38) investment manager. *See id.*

interaction with the person who perpetrated the fraud – unlike Alight, which interacted with the fraudster repeatedly – or that BNY was aware of any of the "red flags" identified by Plaintiff that might have caused it to question the bona fides of the transaction that Alight directed it to process. The agreement specifically withholds authority or control in the issuance of checks that would make BNY Mellon a fiduciary when performing this particular task.

Plaintiff attempts to analogize the custodian in *Leventhal v. MandMarblestone Grp. LLC*, No. 18-CV-2727, 2019 WL 1953247, at *5 (E.D. Pa. May 2, 2019) to BNY Mellon. In *Leventhal*, the court concluded that the custodian of plan assets was acting as a fiduciary. However, in that case the custodian had both the ability to "distribute and dispose of plan funds" and also "general administrative responsibilities" that included taking "all other acts necessary for the administration of the Account." *Id.* Here, by contrast, BNY Mellon does not have any general administrative responsibilities; it holds the Plan assets and distributes them exactly as instructed – nothing more. The *Leventhal* court specifically noted that, "ERISA does not consider as a fiduciary an entity such as a bank when it does no more than receive deposits from a benefit fund on which the fund can draw checks." *Id.* (quoting *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 347 (3d Cir. 2004)).

Plaintiff also has not alleged the required factual "nexus" between the specific action that BNY Mellon took as a directed trustee and the actions that caused the loss alleged in the Complaint – specifically, the unauthorized tampering of Plaintiff's personal information and the unauthorized distribution of her pension benefits. While, as noted above, the Complaint alleges that "Defendants" generally ignored numerous red flags in relation to the fraud, the "red flags" could only have been identified via contact with the perpetrator of the fraud – and only Alight had contact with the perpetrator of the fraud. There is no well-pleaded factual allegation from which a trier of fact could conclude that BNY Mellon was aware of any of the "red flags" or of any of the activity

connected to Plaintiff's account. In fact, the Master Trust Agreement specifically states that BNY Mellon "shall not be responsible nor liable to establish or maintain a record or account in the name of any individual participant or to establish the value of any participant's individual interest in the Fund or any account established hereunder." (Dkt. No. 43-1 at § 7.6). BNY Mellon is not alleged to have had any information except that Alight told it to cut a check for a particular amount made out to a particular person and sent to a particular address. The Complaint simply does not allege that BNY Mellon did anything except follow those instructions.

Plaintiff argues that BNY Mellon was required to but failed to implement reasonable procedures to detect and prevent fraud in her account. (Compl. ¶ 38). But this allegation does not render BNY fiduciarily liable to Plaintiff for draining down the contents of her account. While the Complaint alleges that BNY Mellon "agreed to implement and maintain a comprehensive information security program designed to protect the Plan's sensitive information and to protect against threats or hazards and unauthorized access to or use of such information that could result in harm to Plan participants," (*id.* ¶ 6), no well pleaded fact in the Complaint alleges that BNY Mellon was expected to provide such protection at the level of individual plan participant accounts – nor could it, because, as the Master Trust Agreement provides, BNY Mellon was not responsible to establish or maintain individual accounts or the information associated therewith. The fact that BNY Mellon agreed to implement standard information security safeguards over the information that was in its possession does not mean it was required to provide safeguards for information over which, by the terms of the Master Trust Agreement, it had no dealings.

As Plaintiff has not pleaded a link between any actions of BNY Mellon and the fraudulent conduct alleged in the Complaint, she has not established that BNY Mellon acted as a fiduciary.

BNY Mellon's motion to dismiss the claims against it is GRANTED.[9]

## IV.   The Committee's Motion to Dismiss is Denied

The Committee is the administrator and named fiduciary of the Plan. (Compl. ¶ 4). The Committee does not dispute that it had a fiduciary duty to Plaintiff. However, the Committee argues that the Complaint does not sufficiently allege that it breached that duty or that the Committee caused Plaintiff's loss. (Dkt. No. 39 at 1).

I agree with the Committee. Plaintiff is the unfortunate victim of a clever criminal. But the Committee – the one entity that inarguably can be sued under ERISA (and only under ERISA) – is simply not alleged to have done anything that violates ERISA.

### A.   Plaintiff is Not Required to Exhaust Administrative Remedies To Pursue Her Breach of Fiduciary Duty Claim

The Committee first argues that Plaintiff must exhaust her administrative remedies before pursuing her case in court. In October 2021, Plaintiff submitted a claim to the Claims Administrator, which was denied. (Compl. ¶ 34). While she has a right to appeal that determination and is within the time limit for doing so, she does not plan on exercising her right to an administrative appeal. (Dkt. No. 39 at 4; Dkt. No. 68 at 3-7).

In deciding whether a plan participant should be required to exhaust administrative remedies before filing suit, most courts have distinguished between claims for benefits under the terms of the plan and claims for violations of the statute itself, and have held that only the former require exhaustion. *See Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 564 (6th

---

[9]      Obviously, as BNY Mellon is not a fiduciary with respect to Plaintiff, it is as amenable to suit at common law as Alight will be if it turns out not to be a functional fiduciary for purposes of ERISA. However, while the allegations of the Complaint suggest common law claims that could be asserted in the alternative against Alight, they do not suggest any common law claims that could be asserted against BNY Mellon – meaning that, in the absence of factual allegations that are not apparent to the court at present, any effort to amend the Complaint to allege a common law claim against BNY Mellon would appear doomed to failure.

Cir. 2017) (collecting cases). The Third, Fourth, Fifth, Ninth, Tenth, and D.C. Circuits "have all held exhaustion is not required when plaintiffs seek to enforce statutory ERISA rights rather than contractual rights created by the terms of the Plan." *Stephens v. Pension Benefit Guar. Corp.*, 755 F.3d 959, 965 (D.C. Cir. 2014). The Seventh and Eleventh Circuits on the other hand "have held the exhaustion requirement applies even where plaintiffs assert statutory rights." *Stephens*, 755 F.3d at 965.

The Second Circuit "has not addressed . . . whether exhaustion is required for statutory claims," but has stated that it was "dubious" that a breach of fiduciary duty claim could be "dismissed for failure to exhaust administrative remedies." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100, 102 (2d Cir. 2005). It has noted that that "District courts in the Second Circuit have routinely dispensed with the exhaustion prerequisite where plaintiffs allege a statutory ERISA violation." *Id.* at 102. "Declining to require exhaustion where a plaintiff alleges a statutory ERISA violation – as opposed to a violation of the terms of a plan – makes sense, as statutory interpretation is the province of the judiciary while plan fiduciaries may have expertise in interpreting the terms of the plan itself." *Diamond v. Loc. 807 Lab.-Mgmt. Pension Fund*, No. 12-CV-5559 RRM VVP, 2014 WL 527898, at *7 (E.D.N.Y. Feb. 7, 2014), *aff'd*, 595 F. App'x 22 (2d Cir. 2014); *see also McCulloch v. Bd. of Trustees of SEIU Affiliates Officers & Emps. Pension Plan*, No. 14 Civ. 9348 (PGG), 2016 WL 9022578, at *6 (S.D.N.Y. Mar. 31, 2016), *aff'd,* 686 F. App'x 68 (2d Cir. 2017).

Here, Plaintiff does not seek benefits under the Plan, which could require interpretation of the Plan's terms. Instead, Plaintiff seeks to remedy Defendants' statutory breaches of fiduciary duties.

The Committee attempts to analogize the facts here to those in *Diamond*, in which the Second Circuit held that the plaintiff was required to exhaust administrative remedies despite alleging a statutory violation of ERISA for breach of fiduciary duty. (Dkt. No. 39 at 4). However, there, the Second Circuit determined that the *Diamond* plaintiff was in fact alleging a breach of the terms of the Plan, not a statutory violation of ERISA because the "essence of the cause of action" was that the defendants violated the terms and conditions of the pension plan and pension plan rules. *Diamond*, 595 F. App'x at 25. Therefore, their allegations required that the court interpret the documents and instruments governing the plan at issue. *Id.* Indeed, a "substantial portion" of the plaintiff's brief was devoted to "interpreting the terms of the Plan and explaining why defendants' actions contravened those terms." *Diamond*, 2014 WL 527898 at *8.

In contrast, here, Plaintiff's allegations center on whether the defendants failed to identify and investigate red flags, failed to establish appropriate procedures, and failed to monitor other fiduciaries activities. Determining whether Defendants breached their fiduciary duties in this way will not require interpretation of the Plan's terms. (Compl. ¶ 43). Plaintiff is not required to exhaust her administrative remedies.

### B.   The Complaint Sufficiently Alleges Breach of Fiduciary Duty and Loss Causation As Against The Committee

ERISA imposes fiduciary duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1)(A)–(B). The duty of loyalty requires that the fiduciary act "solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The duty of prudence requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in

a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims." 29 U.S.C. § 1104(a)(1)(B).

First, as noted above, all of the allegations in the Complaint regarding the breach of fiduciary duties were alleged against *all* Defendants generally, without specifying which Defendant in particular engaged in the action giving rise to the alleged breach. (*see supra* pp. 16-17). These vague allegations without further facts for support are generally insufficient to state a claim.

Plaintiff argues that the Second Circuit has recognized that "details about a fiduciary's methods and actual knowledge tend to be in the sole possession of that fiduciary." *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). As a result, "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Id.* at 718 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)).

However, the Second Circuit also stated that "if the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a *reasonable* inference that the defendant committed the alleged misconduct, thus permitting the court to infer more than the *mere possibility* of misconduct." *Pension Ben. Guar. Corp.*, 712 F.3d at 718–19 (internal quotes and citations omitted) (emphasis in original). A reasonable inference cannot be deduced here.

First, Plaintiff alleges that all "Defendants" breached their fiduciary duties by failing to identify, investigate, and act on red flags, suspicious activities, and suspicious distribution requests, as well as failing to confirm authorization for distributions with the Plan participant before making distributions. (Compl. ¶¶ 22,43). However, as was the case with BNY Mellon, it is

implausible to conclude that these allegations are applicable to the Committee, because there is not a single factual allegation tending to show that the Committee was aware of the so-called "red flags," let alone that it ignored them.

The allegations in the Complaint suggest Alight was the only party to have had contact with the perpetrator of the fraud. (*Id.* ¶ 5). As a result, only Alight was in a position to be aware of the "red flags." And the Complaint does not allege that Alight made the members of the Committee aware of those "red flags." Therefore, there is no plausible allegation that the Committee should have been aware that fraudulent activity was taking place with respect to Plaintiff's account.

The Complaint also alleges, in purely conclusory fashion, that the "Defendants" "fail[ed] to monitor other fiduciaries' distribution processes, protocols, and activities." (*Id.* ¶ 43). If indeed the Committee was negligent in its selection of Alight or in monitoring Alight's protocols and activities (whether or not Alight was a fiduciary),[10] it might be liable for breach of fiduciary duty, especially given ERISA's heavily "remedial" nature. Of course the Complaint does not allege any specific facts tending show that the Committee in fact failed to monitor Alight's actions; and Department of Labor regulations state that a fiduciary who has appointed trustees or other fiduciaries is only required to review the performance of those trustees and other fiduciaries "at reasonable intervals" in order to "ensure that their performance has been in compliance with the terms of the plan and statutory standard." 29 C.F.R. § 2509.75-8.

But this is precisely the sort of issue that, in an ERISA case, allows a Complaint to survive a motion to dismiss, because the information about the Committee's monitoring is solely within the knowledge of the Committee and must abide discovery.

---

[10]    I mention only Alight because only Alight is alleged to have done anything wrong – BNY Mellon is simply not alleged to have done anything that would subject it to any liability to Plaintiff.

Similarly, while the allegation that "Defendants" (unspecified) failed to institute reasonable procedures to detect and prevent fraud and theft of Plan assets (Compl. ¶ 38) is vague and insufficiently specific, when read most favorably to an ERISA plaintiff, it appears to allege that the Committee – which is ultimately responsible for protecting the Plan's assets for the benefit of the participants – did not do enough to detect and prevent fraud and theft, crimes of which Plaintiff was most assuredly the victim. Of course, the Committee is not an insurer against any and every possible wrongdoing; if it took reasonable steps to ensure that fraud and theft would be detected (which quite possibly includes by hiring a reputable contract administrator), it will not be deemed to have breached its fiduciary duty to Plaintiff, even though her account was drained by a thief. However, it remains to be seen whether the Committee did take reasonable steps to protect the assets of the Plan against fraud and theft.

In this way, the Complaint also sufficiently alleges loss causation. The Committee argues the loss is alleged to have resulted from a complex, international scam and nothing the Committee or Alight could have done would have prevented the theft. (Dkt. No. 39 at 11). However, if there was in fact a fiduciary breach because the Committee failed to take reasonable steps to protect the Plan's assets against theft, that breach would be connected to the loss.

I emphasize that, by denying the motion to dismiss the ERISA claim against the Committee, the court expresses no view about the ultimate merits of Plaintiff's claim against the Committee. "ERISA's "fiduciary duty of care . . . requires prudence, not prescience." *Pension Ben. Guar. Corp.,* 712 F.3d at 716 (quoting *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.,* 920 F.2d 457, 465 (7th Cir.1990)). This is a very thin complaint as against the Committee. The case involves a fraudster executing on a complex, international scam. The Plan was a victim of fraud and theft just as much as the Plaintiff was. An ERISA plan is not required to have

procedures in place that account for every possibility – i.e., to act as an insurer against all losses. It must adopt reasonable procedures, but not absolutely air-tight procedures, to protect against the possibility of what happened here, which was a heinous crime.

However, at the motion to dismiss stage, the court will not grant the Committee's motion.

## V.    Leave to Amend and Discovery Schedule

Plaintiff asks in that if the court grants any of the Defendants' motions to dismiss it be granted leave to amend.

Fed. R. Civ. P. 15(a) states that "[t]he court should freely give leave [to amend] when justice so requires." Under this liberal standard, leave is generally given as long as (1) the party seeking the amendment has not unduly delayed, (2) that party is not acting in bad faith or with a dilatory motive, (3) the opposing party will not be unduly prejudiced by the amendment, and (4) the amendment is not futile. *Foman v. Davis*, 371 U.S. 178, 182 (1962).

Plaintiff needs to move quickly with any proposed amendment – both for the reason stated above, (*see supra* p. 18), and because I wish to see the case moving.

The discovery schedule for this case is as follows: Once an amended complaint has been filed, the parties will have 180 days to complete discovery – all discovery, including expert discovery. Summary judgment motions, if any, must be filed by 30 days after the close of discovery. A Joint Pre-Trial Order is also due 30 days after the close of discovery. Responsive briefs are due 21 days after the motions are made and reply briefs are due 10 days after responsive briefs are filed.

Discovery disputes in this case will be resolved by Magistrate Judge Ona Wang. The first time there is a discovery dispute that counsel cannot resolve on their own, notify my chambers by letter and I will sign an order referring your case to the Magistrate Judge for discovery supervision.

## VI.    Alight's Motion to Seal

In conjunction with its motion to dismiss, Alight submitted a motion to seal two exhibits: (1) the MSA entered into between the Colgate-Palmolive Company and Alight; and (2) Alight's Report of Investigation related to Plaintiff's claims of identity theft and fraud. (Dkt. No. 47).

Alight argues that the MSA contains commercially sensitive information identifying negotiated terms of service (Dkt. No. 48 at 2). I fail to see why the MSA qualifies for sealing. Alight may submit a brief of no more than five pages explaining what is proprietary about the content of this document. But it is integral to the resolution of this case, which is being conducted in a court of law, subject to the presumption of public access. I would just as soon resolve the issue of its confidentiality now.

Alight argues that the Report of Investigation contains a detailed description of the actions taken to steal Plaintiff's identity and raid her retirement account, as well as the steps Alight took to investigate the conduct of the bad actors. (*Id.* at 3). It argues that the harm of disclosing the information in the Report outweighs the presumption of public access because disclosure of the Report may impair investigations into Plaintiff's claims, reveal information to the individuals who targeted Plaintiff, or serve as a roadmap for other bad actors who want to perpetrate a similar fraud. (*Id.*) Alight notes that it supplied information it discovered through its investigation for the involvement of law enforcement. (*Id.*) It also provided Plaintiff with a copy of the Report. (*Id.*)

However, much of the information in the Report of Investigation mirrors the facts as outlined in the Complaint or the motions to dismiss. To the extent that there are more specific details or personally identifiable information regarding Plaintiff in the Report, these may be redacted. But the Report as a whole cannot remain under seal. Alight has 20 days to identify the precise portions of the Report that it believes should be redacted, and to submit a memorandum explaining, on a line by line basis, why each designation should remain confidential in light of the

presumption of public access. The court will consider that submission and make a final ruling on the confidentiality of the redacted material.

## CONCLUSION

Based on the foregoing, Defendant Alight's Motion to Dismiss is DENIED; Defendant BNY Mellon's motion to dismiss is GRANTED; and the Committee's Motions to Dismiss is DENIED.

The Clerk of Court is respectfully directed to remove Dkt. Nos. 38, 42, 47, and 51 from the Court's list of open motions.

Dated: December 19, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL